Argued and submitted June 26, 1980,
affirmed April 28, 1981

ORE-IDA FOODS, INC.,
*Petitioners,*

*v.*

INDIAN HEAD CATTLE COMPANY,
*Respondent.*

(No. 15,129-L, CA 13805, SC 26839)

627 P2d 469

Carl Burnham, Jr., Ontario, argued the cause for petitioners. With him on the briefs were Cliff S. Bentz and Yturri, Rose, Burnham & Ebert, Ontario.

William A. McCurdy, Boise, Idaho, argued the cause for respondent. With him on the briefs were Jeremiah A. Quane of Quane, Smith, Howard & Hull, Boise, Idaho, and J. Burdette Pratt of Henigson, Stunz, Fonda & Pratt, Nyssa, Oregon.

PETERSON, J.

## PETERSON, J.

In this case an employer (Ore-Ida) of a deceased employee (Gonzalez) paid workers' compensation survivors benefits to Donna Burzota, an unmarried cohabitant of the decedent. Gonzalez was killed on the employer's premises when struck by a truck operated by the defendant, with whom the employer had a contract to remove waste products from the employer's premises. The employer sued the defendant, asserting that the sole cause of the death, and the sole reason why the employer was required to pay the death benefits, was the fault of the defendant. The defendant defended along these lines: (1) Burzota had no cause of action against defendant for wrongful death of Gonzalez; therefore, nothing was assigned to Ore-Ida by operation of law, or otherwise; (2) Ore-Ida had no independent cause of action for the death of the employee; and (3) Ore-Ida had no cause of action under the Workers' Compensation Law. The trial court agreed and sustained the defendant's demurrer to the complaint. The Court of Appeals affirmed.

The issue in this case is: When an employer is required to pay workers' compensation benefits to the unmarried cohabitant of a deceased employee whose on-premises death was caused by the negligence of a third person, can the employer recover from the negligent third person, absent express provision for subrogation or assignment in the Workers' Compensation Law, and where the beneficiary herself has no cause of action for wrongful death.

### THE FACTS

These facts appear from the plaintiff's complaint: Hilario Gonzalez and Donna Lee Burzota had two children and lived together, but they were not legally married. Gonzalez was employed by plaintiff Ore-Ida. Defendant had contracted with Ore-Ida for the removal of potato and corn waste products from Ore-Ida's premises. On April 29, 1977, the defendant, while operating its truck and trailer on Ore-Ida's premises, backed into Gonzalez, killing him. Ore-Ida[1] was required to pay survivor's benefits to Donna

---

[1] There are two plaintiffs in this case, Ore-Ida and its compensation carrier. Except where the context otherwise requires, our reference to Ore-Ida extends as well to the rights of its compensation carrier.

Lee Burzota under Oregon Workers' Compensation Law, ORS 656.226.

Ore-Ida sued defendant to recover the amounts paid to Donna Lee Burzota. The defendant demurred to the complaint, asserting:

1.. No right of contribution or indemnity arose by reason of the contract between defendant and Ore-Ida.

2. Although a cause of action against a negligent third party is given to the decedent's widow, children or dependents, no cause of action is provided to the employer or his insurer, and they are not the proper parties to bring such an action.

3. ORS 656.576 through 656.595 provide an employer with the only means of recovering compensation paid to the beneficiaries of a deceased workman under the Workers' Compensation Act. The statutory remedy is the exclusive method whereby the employer or its insurer can recover reimbursement for compensation paid to the injured worker's beneficiary.

4. Plaintiff's complaint alleges only negligence on the part of the defendant. An employer cannot recover damages from a third party for injuries to an employee caused by the third party's negligence.

## RELEVANT STATUTES AND
## COURT OF APPEALS HOLDING

The resolution of this case involves, first of all, an understanding of the relevant statutes. The Workers' Compensation Law, ORS chapter 656, is a comprehensive set of statutes containing provisions for, among other things, (1) benefits for the support of injured workers and their dependents, and (2) the employer's or compensation carrier's recovery, from responsible third persons, of benefits paid to injured workers and their dependents.

Ore-Ida's compensation carrier was required to pay survivor's benefits to Donna Lee Burzota because of ORS 656.226, which provides:

"In case an unmarried man and an unmarried woman have cohabited in this state as husband and wife for over one year prior to the date of an accidental injury received

by such man, and children are living as a result of that relation, the woman and the children are entitled to compensation under ORS 656.001 to 656.794 the same as if the man and woman had been legally married."

ORS 656.578 provides for claims against third persons by injured workers and their beneficiaries:

"If a worker * * * receives a compensable injury * * * due to the negligence or wrong of a third person (other than those exempt from liability under ORS 656.018), entitling him under ORS 656.154 to seek a remedy against such third person, such worker or, if death results from the injury, the other beneficiaries[1a] shall elect whether to recover damages from such employer or third person. * * *."

ORS 656.591 creates a form of statutory subrogation in the employer's favor:

"(1) An election made pursuant to ORS 656.578 not to proceed against the employer or third person operates as an assignment to the paying agency of the cause of action, if any, of the worker, the beneficiaries or legal representative of the deceased worker, against the employer or third person, and the paying agency may bring action against such employer or third person in the name of the injured worker or other beneficiaries."[2]

---

[1a] The "other beneficiaries" include the surviving spouse and children, ORS 656.204, 656.208, 656.218. *See also,* ORS 656.226.

[2] ORS 656.593 provides for the distribution of the recovery:

"(1) If the worker or his beneficiaries elect to recover damages from the employer or third person, notice of such election shall be given the paying agency by personal service or by registered or certified mail. The paying agency likewise shall be given notice of the name of the court in which such action is brought, and a return showing service of such notice on the paying agency shall be filed with the clerk of the court but shall not be a part of the record except to give notice to the defendant of the lien of the paying agency, as provided in this section. The proceeds of any damages recovered from an employer or third person by the worker or beneficiaries shall be subject to a lien of the paying agency for its share of the proceeds as set forth in this section and the total proceeds shall be distributed as follows:

"(a) Costs and attorney fees incurred shall be paid, such attorney fees in no event to exceed the advisory schedule of fees established by the board for such actions.

"(b) The worker or his beneficiaries shall receive at least 25 percent of the balance of such recovery.

"(c) The paying agency shall be paid and retain the balance of the recovery, but only to the extent that it is compensated for its expenditures for compensation, first aid or other medical, surgical or hospital service, and for

In a related case, *Ore-Ida Foods, Inc. v. Gonzalez,* 43 Or App 393, 602 P2d 1132 (1979), the Court of Appeals held that Burzota was not a "surviving spouse" under our wrongful death statute, ORS 30.020(1),[3] and that Burzota did not, by reason of her relationship with Gonzalez, have the rights of a surviving spouse under the law of intestate succession. 43 Or App at 395, 396.

In denying recovery in the case at bar, the Court of Appeals reasoned (43 Or App at 397):

1.  Ore-Ida cannot recover under ORS 656.591(1) for survivor's benefits paid to Burzota because she had no "cause of action" (as that term is used in the statute) against Indian Head. There is no common law cause of action for wrongful death, and Burzota was "not within the class of those who have a statutory cause of action for wrongful death." Therefore, ORS 656.591(1) created no

the present value of its reasonably to be expected future expenditures for compensation and other costs of the worker's claim under ORS 656.001 to 656.794. Such other costs include assessments for reserves in the Administrative Fund and any reimbursements made pursuant to subsection (3) of ORS 656.728, but do not include any compensation which may become payable under ORS 656.273 or 656.278.

"(d) The balance of the recovery shall be paid to the worker or his beneficiaries forthwith. Any conflict as to the amount of the balance which may be retained by the paying agency shall be resolved by the board.

"(2) The amount retained by the worker or his beneficiaries shall be in addition to the compensation or other benefits to which such worker or beneficiaries are entitled under ORS 656.001 to 656.794.

"(3) A claimant may settle any third party case with the approval of the paying agency, in which event the paying agency is authorized to accept such a share of the proceeds as may be just and proper and the worker or his beneficiaries shall receive the amount to which he would be entitled for a recovery under subsections (1) and (2) of this section. Any conflict as to what may be a just and proper distribution shall be resolved by the board."

[3] ORS 30.020(1):

"(1) When the death of a person is caused by the wrongful act or omission of another, the personal representative of the decedent, for the benefit of the decedent's surviving spouse, surviving children, surviving parents and other individuals, if any, who under the law of intestate succession of the state of the decedent's domicile would be entitled to inherit the personal property of the decedent, may maintain an action against the wrongdoer, if the decedent might have maintained an action, had he lived, against the wrongdoer for an injury done by the same act or omission. The action shall be commenced within three years after the occurrence of the injury causing the death of the decedent."

cause of action in favor of Ore-Ida because Burzota possessed no cause of action for wrongful death which went to Ore-Ida by operation of law.

2. Ore-Ida had no common law cause of action for injury or death to its employee because of *Snow v. West,* 250 Or 114, 440 P2d 864 (1968), which held that an employer has no cause of action against a third person for loss of services of an employee whose injury or death was caused by the third person's negligence. 250 Or at 115, 117, 118.

We affirm. In doing so, however, we should point out that this case has created a tangled thicket of thorny issues—issues which are not susceptible of easy resolution and which involve significant public policy considerations, both pro and con.

## DISCUSSION

■ We agree with the Court of Appeals that Ore-Ida has no rights by reason of ORS 656.591. Burzota had no cause of action against defendant for wrongful death under ORS 30.020. *Ore-Ida Foods v. Gonzalez, supra.* There is no claim that Burzota had any other cause of action against defendant. Therefore, no "cause of action," as that term is used in ORS 656.591(1), was transferred by operation of law to Ore-Ida. The employer's right to recover must therefore exist, if at all, on an existing negligence or indemnity theory apart from the statutory subrogation provisions of the Workers' Compensation Law.

■ The negligence count of the plaintiff's complaint alleges that Gonzalez's death was caused by the defendant's negligence and that as a result of Gonzalez's death Ore-Ida became liable to Burzota for the payment of compensation benefits.[4] The indemnity count alleges the same facts and seeks indemnity. The third count also sounds in indemnity, realleging the same facts as the earlier counts, plus the

---

[4] Although Ore-Ida also claims contribution, any right to contribution under ORS 18.440 requires that the parties be (a) tort feasors who are (b) jointly or severally liable in tort for the same injury. No statutory right of contribution exists in this case because Ore-Ida and defendant are not "jointly or severally liable in tort" for the same wrongful death. The defendant is not liable in tort to Burzota for the death of Gonzalez, and Ore-Ida's liability to Burzota arises not "in tort," but under the Workers' Compensation Law.

further assertion that by reason of a contract between the defendant and Ore-Ida, Ore-Ida is entitled to indemnity from the defendant. The contract provides, *inter alia,* "* * * for the removal [by defendant] * * * of all waste products in a timely and expeditious manner * * *."

### *Recovery on a negligence theory.*

The plaintiff's claim in this case is to recover damages (Workers' Compensation benefits) which it was required to pay because of the negligent infliction of injury (death) to one of the plaintiff's employees.

*Snow v. West,* 250 Or 114, 440 P2d 864 (1968), involved a claim by an employer against a third person for loss of services of an employee whose injury or death was caused by the third person's negligence. We viewed the case as a claim for damages arising from a negligent interference with a contractual relationship and denied recovery, stating that such damages would only be recoverable for an intentional interference with a contractual relationship. 250 Or at 115, 117, 118.

■　　The prevailing rule in the United States and England is that a plaintiff may not recover for economic loss resulting from negligent infliction of bodily harm to a third person.[5] Whether the claim is characterized as one for economic loss,[6] interference with economic expectancy[7] or prospective economic advantage,[8] recovery is normally denied. Reasons for denial of recovery of damages arising from injury to third persons include these:

1.　The defendant owed no duty to the plaintiff.[9]

2.　The damages are too remote.[10]

---

[5] *See* F. James, Jr., *Limitations on Liability for Economic Loss Caused by Negligence: A Pragmatic Appraisal,* 25 Vand L Rev 43 (1972).

[6] *Id.*

[7] *See* Comment, *Negligent Interference With Economic Expectancy: The Case For Recovery,* 16 Stan L Rev 664 (1964).

[8] *See* Comment, *Union Oil Co. v. Oppen: Recovery of a Purely Economic Loss in Negligence,* 60 Iowa L Rev 315 (1974).

[9] *See City of Philadelphia v. Philadelphia Rapid Transit Co.,* 337 Pa 1, 10 A2d 434 (1940).

[10] *The Federal No. 2,* 21 F2d 313, 314 (2d Cir 1927); *Byrd v. English,* 117 Ga 191, 43 SE 419 (1903).

3. The damages are unforeseeable.[11]

4. There was no "proximate cause."[12]

5. Permitting the recovery of damages for injury to third persons will allow limitless recoveries and have ruinous consequences. Such indirect economic losses are too open-ended. Many commentators quote the oft-cited statement of Judge Cardozo that such liability would be "* * * liability in an indeterminate amount for an indeterminate time to an indeterminate class."[13]

6. To allow recovery would lead to a burdensome increase in litigation.[14]

We believe that the denial by other courts of claims for economic loss arising from injury to third persons, although phrased in terms of lack of foreseeability, duty and proximate cause, actually reflects their policy decision to limit recovery of such damages. The number of economic interests which could be damaged from an act are, in some cases, practically limitless, as is illustrated by two cases.

In *Byrd v. English,* 117 Ga 191, 43 SE 419 (1903), the defendant negligently severed an electric power line which served the plaintiff's printing business. The plaintiff claimed loss of profits on printing contracts. The Georgia court denied relief, saying that if recovery was allowed, the plaintiff's customers would similarly be entitled to recover, and so on, *ad infinitum.*

The leading English case in this area is *Weller & Co. v. Foot & Mouth Disease Research Institute,* [1966] 1 Q.B. 569. There a research institute conducting experiments on foot and mouth disease negligently permitted a

---

[11] *See* note 7, *supra* at 675, footnote 65.

[12] *La Societe Anonyme de Remorquage a Helice v. Bennetts,* [1911] 1 K.B. 243, 248.

[13] *Ultramares Corp. v. Touche,* 255 NY 170, 179, 174 NE 441, 444 (1931). *See also* Comment, *Foreseeability of Third Party Economic Injuries—A Problem in Analysis,* 20 Chi L Rev 283, 298 (1953); *Weller & Co. v. Foot & Mouth Disease Research Institute,* [1966], 1 Q.B. 569, 577; James, note 5, *supra* at 48; Comment, note 7, *supra* at 674.

[14] *See Conn Mutual Life Ins. Co. v. N.Y. & N.H. R. R. Co.,* 25 Conn 265, 65 AD 571 (1856); *Stevenson v. East Ohio Gas Co.,* 47 Ohio L Abs 586, 73 NE2d 200 (1946).

virus to escape and infect cattle in the surrounding areas. The minister of agriculture ordered the closing of all local cattle markets, and the plaintiff cattle auctioneers lost business as a result. They sued the defendants for economic damage resulting therefrom. Judge Widgery denied recovery. However, in doing so, he was obviously aware that the injury was a foreseeable result of the negligence, for he stated:

> "* * * [I]n an agricultural community the escape of foot and mouth disease virus is a tragedy which can foreseeably affect almost all businesses in that area. The affected beasts must be slaughtered, as must others to whom the disease may conceivably have spread. Other farmers are prohibited from moving their cattle and may be unable to bring them to market at the most profitable time; transport contractors who make their living by the transport of animals are out of work; dairymen may go short of milk, and sellers of cattle feed suffer loss of business. * * *" 1 Q.B. at 577.

■ This case is arguably distinguishable from *Snow v. West, supra,* in that here plaintiff seeks to recover amounts which it was required to pay by reason of the Workers' Compensation Law. The damages are liquidated and, in a real sense, are imposed upon the employer by operation of law. The Oregon Legislature requires that every Oregon employer "* * * maintain assurance * * * that his subject workers and their beneficiaries will receive compensation for compensable injuries * * *." ORS 656.017. Every Oregon employer is required to pay compensation to subject workers and their beneficiaries if the worker sustains a compensable injury. The employer's obligation exists irrespective of the cause of the compensable injury. Whether the cause be the fault of the employer, the fault of the worker, the fault of a third person, or the fault of no one, the employer is liable for compensation.

Moreover, the legislature, by enacting ORS 656.591 and ORS 656.593 has approved a policy that employers have the right to recover, from third party tortfeasors, for compensation benefits paid to injured workers and their dependents. ORS 656.591 and ORS 656.593 themselves reflect, in a sense, a legislative rejection of the

common law rule that there can be no recovery for damages arising from the negligent infliction of harm to an employee.

■ Even so, the nature of the plaintiff's claim herein is undeniably similar to the claims asserted in *Snow v. West, supra.* So far as the legislative policy is concerned, it is clear that the statutes do not now permit recovery. Whether the omission reflects a conscious legislative decision to disallow the recovery of such damages or is simply a legislative oversight, we do not know. The legislature has the power to create a remedy. In view of our precedent in *Snow v. West, supra,* the absence of statutory authority, the substantial body of caselaw from other jurisdictions, and concern for potential consequences flowing from the recognition of liability in such cases, we are reluctant to extend relief to Ore-Ida on a common law negligence claim.[15]

*Recovery on an Indemnity Theory*

In *Fulton Ins. v. White Motor Corp.,* 261 Or 206, 210, 493 P2d 138 (1972), we stated that indemnity recovery requires proof of three elements:

1. Discharge of a legal obligation owed by the payor to a third person.

2. The person against whom indemnity is claimed must also be liable to the third person.

---

[15] There is precedent for the recovery of such damages. In *Marine Terminals v. Burnside Shipping Co.,* 394 US 404, 89 S Ct 1144, 22 L Ed 2d 371 (1969), a longshoreman was killed when he fell into an unguarded hatch on the defendant's ship. The widow of the longshoreman was awarded compensation from the employer stevedoring company (Marine Terminals) under the Longshoreman's Act. She also filed a wrongful death suit against the ship (Burnside). The statutory limit on her wrongful death claim was $30,000. Burnside brought a separate action in the same federal court against the employer, seeking indemnity for any damages for which it might be held liable to the widow. The employer counterclaimed for the benefits it was obliged to pay the widow under the Longshoreman's and Harbor Worker's Compensation Act, 33 U.S.C. § 933, the potential liability for which was $70,000, far in excess of the statutory wrongful death limit. Its theory was that Burnside, as owner of the ship, owed the employer the duty of providing a safe workplace for its employees, which duty Burnside allegedly breached. The Supreme Court allowed recovery, holding that the statutory remedy did not "* * *" preclude other nonstatutory rights in the absence of clear language to that effect." 394 US at 412-413. The Supreme Court made no reference to the common law rule discussed herein at page 916. *Contra: Crab Orchard Imp. Company v. Chesapeake and O. Ry. Co.,* 115 F2d 277 (4th Cir 1940).

3. As between the claimant payor and the person against whom indemnity is claimed, the obligation ought to be discharged by the latter.

■ The first and third elements appear to be present. But the second element is lacking. Indian Head was not liable to Burzota. According to section 76 of the Restatement of Restitution (1937), common law indemnity is based upon the existence of facts which, if proved, would establish each party's liability to the third party, and as between the two parties, the person against whom indemnity is claimed should have discharged the obligation.[16]

---

[16] *U. S. Fidelity v. Kaiser Gypsum,* 273 Or 162, 167-176, 539 P2d 1065 (1975), suggests that a common tort liability to the third person may not be required. In *U. S. Fidelity v. Kaiser Gypsum, supra,* it was held that a supplier of a machine could recover common law indemnity from an injured worker's employer even though the employer was not jointly liable *in tort* to the injured worker. In *Kaiser Gypsum,* the plaintiff's insured, Zinda, supplied and installed a machine in the Kaiser plant. The machine had been designed to be equipped with a guard. At Kaiser's request, Zinda removed the guard during testing. One Russell was employed by Kaiser and was injured while using the machine. Russell received workers' compensation benefits and also filed a third-party action against Zinda. Zinda tendered the defense to Kaiser, the tender was rejected, and the case was thereafter settled for $25,000. The plaintiff, being subrogated to Zinda's rights, sued Kaiser to recover its defense costs and the $25,000.

The principal issue in the case was whether Kaiser was immune from liability by reason of ORS 656.018(1), which provided that an employer who pays compensation benefits is relieved of all other liability for compensable injuries to subject workmen and anyone otherwise entitled to recover damages from the employer "on account of such injuries." The case raised, for the first time in Oregon, the issue which had previously been decided by the Supreme Court of the United States in a landmark decision, *Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp.,* 350 US 124, 76 S Ct 232, 100 L Ed 133 (1956). Kaiser also asserted that the exclusive remedy provisions of ORS 656.018(1) barred any other claims against the employer. We held that the statute did not bar a common law claim for indemnity.

The *Kaiser Gypsum* opinion discussed a number of other indemnity decisions, referring to such indemnity claims variously as a "right to indemnity based on [an] alleged breach of an independent duty" (273 Or at 167), an "implied agreement to indemnify arising out of a contract" (273 Or at 172), a "claim for indemnity based on a breach of an implied duty to work safely" (273 Or at 171), as indemnity arising "from a breach of the contractual duty * * * to perform the work in a careful and prudent manner" (273 Or at 170), and as indemnity based on the theory that the instrumentality "was under the employer's exclusive control at the time in the course of performance of its contract" (273 Or at 173). We held that the Act did not bar a claim against the employer for indemnity when the injury to the employer "resulted from the breach of an independent duty, express or implied, owed by the employer to the third [person] * * *." 273 Or at 166. Although *Fulton Ins.* was cited in the opinion, there is no discussion of the question whether indemnity exists in the absence of a common *tort* liability to the injured worker.

■ In the case at bar, there is no "common liability" of any kind toward the third person, Burzota. Ore-Ida has a workers' compensation liability toward Burzota, but the defendant-putative indemnitor has no liability, in tort or otherwise, to Burzota. *Kaiser Gypsum* (note 16, *supra*) does not support the proposition that recovery in indemnity exists absent *any* liability by the putative indemnitor to the third person.

## CONCLUSION

We should add that this case has raised other challenging issues which we have considered, but which need not be discussed in view of our affirmance.[17] We frankly admit to less than 100 percent certainty with the result in this case. A person who is without fault is subjected to a substantial liability due to the fault of another, without remedy against the person whose fault created the liability. The legislature, of course, can remedy the situation; but that will not avail Ore-Ida in this case. We are convinced that we should not, at this time, create or permit a common law remedy under the facts of this case, and we therefore affirm.

**DENECKE, C. J.,** concurring.

I concur in the majority opinion. I write specially to state another reason for concurring.

In the last 35 years, as the legislatures and the courts provided for recovery for more persons who were injured and the amount of recoveries increased, those required to pay these more frequent and larger recoveries increasingly sought reimbursement for their losses. The

---

Relative to the "common liability" requirement in indemnity and/or contribution, see M. Hertz, *The Tort Triangle: Contribution From Defendants Whom Plaintiff Cannot Sue,* 32 Me L Rev 83, 101 (1980); J. Jensvold, *A Modern Approach to Loss Allocation Among Tortfeasors in Products Liability Cases,* 58 Minn L Rev 723 (1974); 1 F. Harper and F. James, The Law of Torts 718, § 10.2.

[17] Such issues include these:

1. Is Ore-Ida necessarily limited to the remedies provided by the Workers' Compensation Law, ORS 656.591(1)? Does Ore-Ida have any additional common law remedies? *See Marine Terminals v. Burnside Shipping Co.,* 394 US 404, 412-414, 89 S Ct 1144, 22 L Ed 2d 371 (1969).

2. To what extent does the common law rule denying recovery in negligence for damages arising from injuries to third persons bar indemnity recovery?

already recognized remedy of indemnity was tried as a reimbursement device. It worked. The decision in *Ryan Stevedoring Co. v. Pan-Atlantic SS. Corp.,* 360 US 124, 76 S Ct 232, 100 L Ed 133 (1956), caused an all out exploitation of indemnity which clogged the dockets of the federal courts. *See* S Rep No 1125, 92d Cong, 2d Sess 9 (1972). The popularity of indemnity spread rapidly from the *Ryan* context of shipowner versus stevedore to other areas such as products liability.

In the maritime area, the havoc created by indemnity litigation was brought to the attention of Congress. In 1972 it amended the Longshoremen's and Harbor Workers' Act. 33 USCA § 905. One purpose of the amendments was to curtail the indemnity litigation between shipowner and stevedore. Gorman, *The Longshoremen's and Harbor Workers' Compensation Act - After the 1972 Amendments,* 6 Journal of Maritime Law and Commerce, 1, 22 (1974).

In the maritime area most of the would-be indemnitors and indemnitees are liability insurance companies. I have no statistics; however, experience causes me to believe that in other areas in which indemnity is commonly sought, the real parties in interest are insurers or other kinds of persons who have a large base from which to secure reimbursement for their losses; that is, insurance premium payers, customers, etc.

At this time of extreme court congestion I am of the opinion that courts should not seek to extend the scope of indemnity in order to allocate losses between parties who can otherwise widely distribute their losses.

Forty years ago Fleming James wrote criticizing the movement to abolish or limit the rule prohibiting contribution among joint tortfeasors. *Contribution Among Joint Tortfeasors,* 54 Harv L Rev 1156 (1941). He stated:

> "* * * Of course, insurance companies and self-insurers are fully as much entitled to be shielded from the hardships of injustice as individuals are, but the actual operation of the present rule is very different in its effect upon them because each company of this kind is a constant litigant. As among these perennial defendants it is inevitable that claims for contribution will cancel out in the long run. * * *." 54 Harv L Rev at 1168.

Similarily, the insurers and self-insurers who are would-be indemnitors or indemnitees are perennial litigants and their claims for indemnity and efforts to avoid indemnity "will cancel out in the long run" and the time and expense of the courts should not be used to allot losses between them.

**TONGUE, J.,** specially concurring.

I concur in the opinion by the majority. This has been a difficult decision, for reasons stated by the majority. I would point out, however, that not only was this case submitted to this court for decision after oral argument on June 26, 1980, over ten months ago, but that this was one of the nine cases upon which a proposed opinion had not been written for more than 90 days as of December 31, 1980.

In other words, the long delay in the decision of this case has not been so much the result of the deliberative process in which all members of the court participate in discussion, analysis and criticism of proposed opinions - a necessary process to assure correct and well-reasoned opinions by this court. This is a process which may extend over a period of several weekly court conferences. Instead, the principal cause of the long delay in the decision of this case has been that no proposed opinion was written for more than 90 days—more than six months in this case—so as to provide a basis for the beginning of that deliberative process.

This is the principal cause for the long delays in many decisions by this court and is a problem which in recent months has become even more serious, as demonstrated by the fact that as of April 10, 1981, the date of the latest statistical tabulation, of 47 cases still "under advisement" and undecided after oral argument, 18 of such cases had been "assigned but unwritten" for more than 90 days, compared with 9 cases "under advisement" and "assigned but unwritten" for over 90 days as of December 31, 1980. Also, the latest statistics available show that during the first three months of 1981 the average elapsed time from oral argument to decision increased to 123 days, compared with an average of 101 days during the first three months of 1980, in spite of the fact that the number of cases heard on oral argument during the same period declined from 44 in 1980 to 39 in 1981.

It has been previously proposed that because this court is now a court of review, with control over the number of cases to be heard and decided by it, it would be reasonable to require by statute or rule of court that members of this court prepare proposed opinions on all cases assigned to them within 90 days.[1] In response, it has been said that members of the court should not be required by statute or rule of court to write proposed opinions within 90 days for two reasons: (1) In the preparation of an opinion for a difficult case it is better to take the time required to prepare a "good opinion," rather than a poor, hastily prepared opinion, and (2) different members of the court have different "priorities," some members considering that the writing of opinions is of no more importance than the study of proposed opinions by other members of the court for possible errors, and some members considering that the participation in other law and court-related programs is also of comparable importance.

The need for "good opinions" is of obvious importance. The reason why most, if not all, proposed opinions are not prepared within 90 days, however, has not been that the cases have been so complicated as to require 90 days for the preparation of a "good opinion." Instead, the primary reasons have been that judges have allowed their "backlog" of "assigned but unwritten" cases to build up until several of such cases are over "90 days old" and that meanwhile other "priorities" have been considered to be of more importance.

As for "priorities," the need for each judge to carefully scrutinize proposed opinions by other judges is also of obvious importance, as is the need for judges to participate in at least some law and court-related programs. In my opinion, however, both the need for "good opinions" and the matter of such "priorities" must be "balanced" against the importance of deciding cases with reasonable promptness.

It has been stated that one of the principal causes of public dissatisfaction with the courts is that litigation

---

[1] See concurring opinion in *State v. Quinn,* 290 Or 383, 411-422, 623 P2d 630 (1981). See also concurring opinion in *State v. Classen,* 285 Or 221, 242, 590 P2d 1198 (1979).

takes too long and that "justice delayed is justice denied."[2] In my opinion, the "standard" for appellate courts adopted by the American Bar Association for "timely disposition" of an average of 60 days from oral argument to decision, with a maximum of 90 days except in cases of "extraordinary complexity," represents a reasonable and proper "balancing" of these competing needs and "priorities." For the same reasons, it is my opinion that a "standard" by statute or court rule requiring that members of this court at least prepare proposed opinions within 90 days in all cases assigned to them would not only be a reasonable rule, but one representing a proper "balancing" of these competing needs and priorities.[3]

With reference to the concurring opinion by Tanzer, J., I respect the views expressed, despite some of its strong language to which I will not respond in kind.

First, Justice Tanzer views my concurring opinion as a "reflection upon the diligence of the author of the majority opinion." No such reflection is intended. Although I may disagree with the "priorities" of the author of that opinion, he is a diligent member of this court for whom I have great respect. What I write is intended, however, as a reflection upon the failure of this court to come to grips with the increasingly serious problem of delay in its decision of cases. The delay in the decision of this case is only symptomatic of that problem. But for the increasingly serious nature of that problem I would not have written this concurring opinion.

Next, Justice Tanzer repeats the contention that the present role of this court as a court of "discretionary review" is one which calls for "thoughtfulness, not speed"; that "[j]udicial dispatch is preferable to quick and dirty judicial work to meet deadlines," and that "the court has deliberated responsibly in this case." I do not disagree. With all due respect, however, I believe that the suggestion that a member of this court should be able to write a proposed opinion in a case assigned to him within 90 days—

---

[2] See concurring opinion in *State v. Quinn, supra,* at 417.

[3] For a statement of further reasons in support of such a rule, see concurring opinion in *State v. Quinn, supra,* at 411-422.

three full months—is hardly a demand for "quick and dirty judicial work to meet deadlines." As previously stated, the problem is one of balancing the need for thorough and "thoughtful" opinions, arrived at after proper deliberation by the entire court, against the equally important need that cases be decided with reasonable promptness. This problem is not one which arises from a conflict in personalities among members of the court, as has also been suggested, but is one involving a difference in "priorities" and a proper balance of such priorities.

Finally, Justice Tanzer protests what he regards as a "misuse" and "abuse" of the pages of these reports by my concurring opinion in this case, which he regards as the use of a "subscriber-subsidized soapbox" for a "broadcast of personal opinions unrelated to caselaw." He suggests that a more proper vehicle by a judge for such criticism would be "in the press, in the law reviews, before the legislature, in political discussion at election time." Again, with all due respect, it is my view that it would be improper for a member of this court to express criticism of this court by going to the press or to the legislature, or by engaging in "political discussion," and I have deliberately refrained from doing so.

What I have undertaken to do in this case and in other cases is not a pleasant task for a member of a collegial court who has both affection and respect for all of his brethren. I first did so in *State v. Classen,* 285 Or 221, 238, 590 P2d 1198 (1979), a criminal case in which a wrongful conviction that should have been set aside was not reversed by this court for more than eight months after oral argument. I still believe that it was proper for a member of this court, in concurring in that decision, to protest that long delay. Indeed, not to protest would have given the impression of acquiescence in that long delay. In *Haynes v. Burks,* 290 Or 75, 91, 619 P2d 632 (1980), involving petition for a writ of habeas corpus for denial of a speedy trial and which was not decided for over four months, contrary to the tradition that habeas corpus proceedings should be decided in a matter of hours or days, not weeks or months, I again protested the delay in that decision in a concurring opinion and believe that it was not

improper to do so. More recently, in *State v. Quinn,* 290 Or 383, 407, 623 P2d 630 (1981), and in *Sterling v. Cupp,* 290 Or 611, 633, 625 P2d 123 (1981), I have continued to protest, rather than acquiesce, not only the delays in the decisions of those cases, but the increasingly serious problem of delays on appeals to this court in terms of the increasing number of cases which have been "assigned but unwritten" by members of this court for more than 90 days, despite the fact that each year since 1976 this court has decided fewer and fewer cases - from an average of 41 opinions per judge in 1976 to an average of 17.6 opinions per judge in 1980. As previously noted, this same trend has continued during the first three months of this year.

As stated in *State v. Quinn, supra,* at 417, "I find myself both frustrated and saddened by the failure of this court to take effective action toward a solution of what has become a problem of such a magnitude as to result in what I believe to be a partial paralysis of the effective functioning of this court as a court of justice in the sense that 'justice delayed is justice denied.'" Having entered this arena, however, I do not intend to withdraw until this court takes some such effective action, at which time I shall be only too glad to do so.

**TANZER, J.,** concurring.

I write separately because I do not wish the concurring opinion of my colleague, Justice Tongue, to be taken as a credible reflection upon the diligence of the author of the majority opinion or of the court. The majority opinion in this case is like the tip of an iceberg: it describes our decision not to modify established principles of negligence and indemnity, but it does not begin to reflect the enormous amount of investigation, analysis, rumination and collegial interplay that preceded its issuance. That the resulting opinion is no milestone in legal history does not mean that the author dawdled or that the court spun its wheels.

Oregon's appellate judicial system has been fundamentally altered since the publication of Tongue, *Delays on Appeal to the Oregon Supreme Court,* 36 Or L Rev 253 (1957). The underlying assumptions of that criticism were valid under the conditions of that day but they are no

longer valid under the changed conditions of a generation later. The Supreme Court is now a court of discretionary review. Speedy action on petitions for review is desirable because litigants are best served by a prompt decision and the decision of the Court of Appeals should not be unduly delayed. We should intervene only where the reason to review is sufficient to justify delaying the effect of the Court of Appeals decision. Where review is allowed, however, there is usually an issue of broader significance. The court may be called upon to formulate law which will influence the future conduct of countless lawyers and clients and the decision of pending and future cases.[1] Thus, review is a time for thoughtfulness, not speed; for deliberation, not haste. Judicial dispatch is preferable to quick and dirty judicial work to meet deadlines. Today, the Supreme Court should be evaluated on the quality of its opinions, not the quantity or the swiftness of their preparation. Every judge has his or her own speed and his or her own sense of responsibility of office. Moreover, one-judge opinions are to be avoided, but collegial participation takes time and does not show up statistically. Unless the judge has delayed irresponsibly, there is no reason to scold him. The court has deliberated responsibly in this case and the fact that it was not done fast enough to satisfy one of our members does not detract from that conclusion.

The most important reason for this separate opinion, however, is to protest what I regard as the misuse of the pages of these reports. Judicial opinions should reflect the legal reasoning of the court with the objective of clarifying the law for the assistance of the bench, bar and public. Access to the Oregon Reports for publication of our opinions is a privilege of appellate judicial office. To use that privilege for the publication of one's non-legal opinions having nothing whatever to do with the rationale of the case before the court is, in my opinion, an improper use of that privilege, however well intended. Criticism of the

---

[1] The ABA Standards for Appellate Courts relied upon by Justice Tongue differentiate between courts of various size whereas the distinction between Oregon appellate courts is one of function: The Court of Appeals is decisional, the Supreme Court doctrinal. See Internal Practices of the Court of Appeals at 1. Thus, the ABA time standards (actually, guidelines rather than standards) are of interest in this respect, but not entirely apt to the Oregon situation.

performance of the court is a healthy sign of a free society and judges have the same right of free speech as others, but the place for judges to do so is in the same places as non-judges may do so: in the press, in the law reviews, before the legislature, in political discussion at election time or any other appropriate private or public forum. The place is not the Oregon Reports, however, because they are for our legal opinions. They are not our subscriber-subsidized soap-box. To use the Oregon Reports as a vehicle for the broad-cast of personal opinions unrelated to caselaw is an abuse of our official privilege. Having thus violated the principle I have stated, I shall attempt to continue to abide by it in the future.