536 November 28, 2023 No. the32

IN THE SUPREME COURT OF THE
STATE OF OREGON

John M. MARSHALL
and Karen M. Marshall, individuals;
Patsy L. Marshall, an individual;
Patsy L. Marshall, as Personal Representative
of the Estate of Richard L. Marshall, Deceased;
and Marshall Associated, LLC,
an Oregon limited
liability corporation,
*Respondents on Review,*

*v.*

PRICEWATERHOUSECOOPERS, LLP,
a limited liability partnership,
*Defendant,*

*and*

SCHWABE WILLIAMSON & WYATT, P.C.,
an Oregon professional corporation,
*Petitioner on Review.*
(CC 17CV11907) (CA A169635) (SC S069442)

On review from the Court of Appeals.*

Argued and submitted November 29, 2022.

Janet M. Schroer, Hart Wagner, LLP, Portland, argued the cause and filed the briefs for petitioner on review. Also on the briefs was Matthew J. Kalmanson, Portland.

Scott F. Hessell, Sperling & Slater, P.C., Chicago, Illinois, argued the cause for respondents on review. John J. Dunbar, Dunbar Law LLC, Portland, filed the brief for respondents on review. Also on the brief was Scott F. Hessell, Chicago.

Kristen G. Williams, Williams Weyand Law, LLC, McMinnville, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

_____

* Appeal from Multnomah County Circuit Court, Jerry B. Hodson, Judge. 316 Or App 416, 505 P3d 40 (2021).

Laura E. Coffin, Luvaas Cobb, Eugene, filed the brief for *amicus curiae* Professional Liability Fund.

Before Flynn, Chief Justice, and Duncan, Garrett, James and Masih, Justices, and Kistler and Walters, Senior Judges, Justices pro tempore.**

FLYNN, C.J.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for consideration of plaintiffs' second assignment of error.

James, J., dissented and filed an opinion. Masih, J., dissented and filed an opinion.

_____

** Balmer, J., retired December 31, 2022, and did not participate in the decision of this case. Nelson, J., resigned February 25, 2023, and did not participate in the decision on this case. DeHoog and Bushong, JJ., did not participate in the consideration or decision of this case.

**FLYNN, C.J.**

Under ORS 12.115(1), "[i]n no event shall any action for negligent injury to person or property of another be commenced more than 10 years from the date of the act or omission complained of." At issue in this case is whether that statute applies to actions in which the plaintiffs allege that their attorney negligently caused injury consisting solely of financial loss—here, the cost to plaintiffs of attempting to defend themselves against a claim for unpaid federal taxes and the anticipated cost of paying that tax liability. As we will explain, we conclude that the legislature intended the phrase "negligent injury to person or property" in ORS 12.115(1) to include negligence claims seeking to recover for the kind of injury to economic interests that plaintiffs have alleged.

## BACKGROUND

In this action, which was filed in 2017, plaintiffs alleged that defendant law firm had negligently advised plaintiffs—in 2003—regarding potential tax ramifications of a proposed business transaction.[1] Plaintiffs also alleged that, as a result of that negligent advice, they had incurred over $2 million in legal fees defending an Internal Revenue Service claim for back taxes related to the transaction and that they expected to incur approximately $20 million in liability for back taxes, penalties, and interest. Defendant moved to dismiss plaintiffs' negligence claim, contending that the pleadings showed that the claim was time-barred under ORS 12.115(1). *See* ORCP 21 A(1)(i) (providing that a defendant may raise by motion a defense "that the pleading shows that the action has not been commenced within the time limited by statute").[2] The trial court granted defendant's motion and entered a limited judgment, from which plaintiffs appealed.[3]

The Court of Appeals reversed the limited judgment, concluding that the statutory phrase "negligent injury

---

[1] Plaintiffs also named as a defendant their accounting firm for the transaction, PricewaterhouseCoopers, but that defendant is not a party to this appeal.

[2] At the time when defendant filed its motion, the provision now set out at ORCP 21 A(1)(i) was numbered ORCP 21 A(9).

[3] Plaintiffs' complaint alleged other claims that the limited judgment did not address and are not at issue before this court.

to person or property" does not encompass plaintiffs' claim because the injury alleged was for purely financial losses. *Marshall v. PricewaterhouseCoopers, LLP*, 316 Or App 416, 432, 441, 505 P3d 40 (2021). We allowed review and now conclude that the trial court correctly concluded that ORS 12.115(1) applied to the type of claim alleged by plaintiffs. Accordingly, we reverse the decision of the Court of Appeals and remand for that court to address plaintiffs' remaining assignment of error.[4]

## ANALYSIS

Defendant challenges the conclusion of the Court of Appeals that plaintiffs' claim for negligent legal representation is not subject to the time limitation imposed by ORS 12.115(1), a so-called statute of ultimate repose. As we have explained, statutes of repose are enacted by the legislature to supplement statutes of limitation. Statutes of limitation "limit the time a party has to initiate an action once a claim has *accrued*"—a concept that means that a statute of limitations "[g]enerally *** does not begin to run until the injured party knows or should know that it has been injured." *Shasta View Irrigation Dist. v. Amoco Chemicals*, 329 Or 151, 161, 986 P2d 536 (1999) (internal quotation marks and brackets omitted; emphasis added). And statutes of repose supplement that somewhat unpredictable approach to the time that a party will have to initiate an action, by setting "maximum times to file a claim, regardless of the date of discovery of an injury or other circumstances that may affect the expiration of a statute of limitations." *Id.* at 162. We have described statutes of repose as reflecting "the public policy of allowing people, after the lapse of a reasonable time, to plan their affairs with a degree of certainty, free from the disruptive burden of protracted and unknown potential liability." *Johnson v. Star Machinery Co.*, 270 Or 694, 701, 530 P2d 53 (1974).

The legislature enacted the statute of repose in ORS 12.115(1) in 1967. Or Laws 1967, ch 406, § 2. The new

---

[4] In the Court of Appeals, plaintiffs raised a second assignment of error that, even if ORS 12.115 applies generally to claims for injury to economic interests, the trial court nevertheless erred in concluding that it barred plaintiffs' negligence claim. In a footnote, the Court of Appeals observed that its construction of the statute made it unnecessary to reach plaintiffs' alternative, second assignment of error. *Marshall*, 316 Or App at 418 n 1.

statute was a reaction to this court's 1966 decision in *Berry v. Branner*, 245 Or 307, 421 P2d 996 (1966), which held that a cause of action for medical malpractice involving a foreign object left in the body did not "accrue," for purposes of the statute of limitations in ORS 12.010 (1965), "until the patient knew or, in the exercise of reasonable care, should have known of the injury inflicted upon her." *See Josephs v. Burns & Bear*, 260 Or 493, 496-99, 491 P2d 203 (1971), *abrogated on other grounds by Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 23 P3d 333 (2001) (describing *Berry v. Branner* and history of ORS 12.115(1)). ORS 12.115(1), which has remained unchanged since being enacted in 1967, provides:

> "In no event shall any action for negligent injury to person or property of another be commenced more than 10 years from the date of the act or omission complained of."

It is undisputed that plaintiffs' claim is based on conduct that occurred more than 10 years before plaintiffs commenced the present action. It also is undisputed that plaintiffs have alleged a negligence claim against defendants. Thus, the only aspect of ORS 12.115(1) that is in dispute before us is whether plaintiffs' allegations of solely financial loss describe the kind of "injury to person or property" to which that statute applies. We resolve the parties' dispute about the meaning of the statute by employing the analytical framework described in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993), and modified in *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009). As with all questions of statutory construction, our "paramount goal" is to ascertain the intent of the legislature that enacted the disputed provision, and we determine that intent by examining the text, in context, as well as legislative history "where that legislative history appears useful to the court's analysis." *Gaines*, 346 Or at 171-72. The dispute here turns on what types of negligence claims the legislature intended to describe with the phrase "negligent injury to person or property" in ORS 12.115(1).

In considering what the legislature intended a statutory term to mean, it is helpful to understand how the term is used. When considering the meaning of terms of common usage, we ordinarily presume that the legislature intended

their ordinary meaning. *Id.* at 175; *PGE*, 317 Or at 611 (explaining that "words of common usage typically should be given their plain, natural, and ordinary meaning"). But if the context or legislative history of a statute indicate that the legislature intended a term to have a meaning "drawn from a specialized trade or field," so-called "terms of art," we consider "the meaning and usage of those terms in the discipline from which the legislature borrowed them." *Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 296, 337 P3d 768 (2014). When a term is drawn from the legal field, we often "look to its established legal meaning as revealed by, for starters at least, legal dictionaries." *Id.* (internal quotation marks omitted).

Here, both parties assert that the phrase "negligent injury to person or property" has an established meaning when used in the context of a legal action, and they presume that the legislature intended the phrase to have its established legal meaning. But they offer competing versions of what the legislature understood that phrase to mean as a legal "term of art." According to defendant, in 1967, "injury to person or property" was defined by contemporary legal dictionaries as referring to civil injuries, generally—including injury consisting of financial loss. Thus, defendant contends that the legislature intended the phrase "negligent injury to person or property" to reach negligence claims for injury consisting of financial loss. According to plaintiffs, however, Oregon case law gives the phrase "*negligent* injury to person or property" a more specialized meaning that encompasses "bodily injuries including their psychic consequences, and physical damage to existing tangible property, *but not financial losses.*" (Emphases added.) They point to a concept that has developed in this court's case law to distinguish between the types of injury for which everyone ordinarily is liable in negligence and the type of injury for which liability depends on a "source of duty outside the common law of negligence." *See Hale v. Groce*, 304 Or 281, 284, 744 P2d 1289 (1987) (describing rule). Both parties are correct to an extent, but defendant's understanding of the phrase better reflects what the 1967 legislature intended the statutory phrase to mean.

        Before explaining why defendant's proposed mean-
ing of the phrase "negligent injury to person or property"
better captures the intent of the 1967 Legislative Assembly,
we pause to consider the parties' premise that the legisla-
ture intended to use the phrase "negligent injury to person
or property" as a legal term of art. ORS 12.115(1) addresses
a legal concept—an outside limit on when a legal action for
negligence can be filed—meaning that the intended audi-
ence was those who would file, or defend against, a legal
negligence action. And in doing so, the legislature used
terms that had specific, established meanings in the legal
context. Thus, although many of the terms in the phrase
"negligent injury to person or property" might—in a differ-
ent context—also be terms of common usage, in the context
of ORS 12.115(1), we agree with the parties that the legisla-
ture most likely intended the terms to mean what they were
understood to mean in the legal field at the time.

        Defendant is correct that, as used in the legal field
at the time, the phrase "negligent injury to person or prop-
erty" was commonly understood as reaching injury that con-
sisted of financial loss. In 1967, "injury" had an established
legal meaning of "[a]ny wrong or damage done to another,
either in his person, rights, reputation, or property." *Black's
Law Dictionary* 924 (4th ed 1951). And the phrase "[i]njuries
to person or property" was associated with the broad con-
cept of "civil injury," which was defined as "[i]njuries to per-
son or property, resulting from a breach of contract, delict,
or criminal offense, which may be redressed by means of a
civil action." *Id*.; *see also Webster's Third New Int'l Dictionary*
1164 (unabridged ed 2002) (specifying that "injury," when
used as a legal term, means "a violation of another's rights
for which the law allows an action to recover damages or
specific property or both"; the term is "comprehensive," and
it includes "an act or result involving an impairment or
destruction of right, health, freedom, soundness, or loss of
something of value").

        The term "property" had both a common usage and
a usage in the legal field, but both were similarly broad.
"Property" in the legal context was defined in contemporane-
ous authorities as including "everything which is the subject

of ownership, corporeal or incorporeal, tangible or intangible, visible or invisible, real or personal *** extend[ing] to every species of valuable right or interest." *Black's* at 1382. Common usage of the term "property" could be equally broad.[5] The common usages described by *Webster's* included:

> "[**2**] **b :** the exclusive right to possess, enjoy, and dispose of a thing **:** a valuable right and interest primarily a source or element of wealth **:** OWNERSHIP *** [and **2**] **c :** something to which a person has a legal title **:** an estate in tangible assets (as lands, goods, money) or intangible rights (as copyrights, patents) in which or to which a person has a right protected by law."

*Webster's* at 1818.

As plaintiffs emphasize, however, we have cautioned against relying solely on dictionary definitions to determine the meaning of statutory terms "without critically examining how the definition fits into the context of the statute itself." *State v. Gonzalez-Valenzuela*, 358 Or 451, 461, 365 P3d 116 (2015). Thus, the fact that the legislature used a phrase—"negligent injury to person or property"—that is capable of including negligently caused injury to another person's economic interests does not preclude plaintiffs' understanding that the 1967 Legislative Assembly used the phrase "negligent injury to person or property" to capture a more specialized, and more limited, category of injury.

The legislative history of ORS 12.115(1), however, strongly suggests that the 1967 Legislative Assembly intended the new negligence statute of repose to apply to actions for negligent injury to a broad variety of property interests. As indicated above, the legislature enacted the statute of repose set out in ORS 12.115(1) in response to this court's decision in *Berry* that, for certain actions for medical malpractice, the statute of limitations did not begin to run until the injury was discovered or, in the exercise of reasonable care, should have been discovered by the patient.

---

[5] We agree with Justice James's dissent that our cases have not articulated a clear basis for determining whether the legislature intended to use a term of art when the same term also appears in ordinary usage and that we must exercise caution when the meaning of a statute could turn on that distinction. *See* 371 Or at 558 (James, J., dissenting). But in this instance, labeling the term "property" as either "common" or "legal" does not determine the meaning of the statute.

*See Josephs*, 260 Or at 496-97. The holding in *Berry* "was a reversal of previous case law which held that in such situations the cause of action accrued and the statute commenced to run at the time of the negligent act or omission," regardless of whether the plaintiff had become aware of the negligently caused harm. *Johnson*, 270 Or at 699. Although the legislature could have been satisfied with a policy that allowed plaintiffs to timely pursue their negligence actions whenever the harm was discovered, it favored a policy that would set an outside cut-off date for liability arising from negligently caused harm.

When initially introduced, the proposed legislation addressed only actions fitting the exact fact-pattern of *Berry*—that is, "[a]n action to recover damages for injuries to the person where in the course of any medical, dental, surgical or other professional treatment or operation," a "foreign substance" was "negligently permitted to remain" within the patient's body. Senate Bill (SB) 134 (1967). For such actions, the bill specified a two-year statute of limitations based on the date of discovery, "provided that such action shall be commenced within six years from the date of the treatment or operation upon which the action is based." *Id.* In other words, as originally introduced, SB 134 expressly codified *Berry*'s holding that a discovery rule governs the statute of limitations for medical negligence actions involving harm from a foreign object, but it combined that with an outside limit—or statute of repose—on the time for filing those actions. The Senate changed the outside limit to seven years but otherwise passed the bill as introduced. *See* Senate Judiciary Committee Report on SB 134 (Mar 22, 1967).

As we observed in *Josephs*, however, "it is apparent from the legislative history that the members of the legislature recognized that the rationale of *Berry* might be equally applicable to a host of other situations in which a defendant's negligence went understandably undetected until after the pertinent statutes of limitation had expired." 260 Or at 497-98 (internal footnote omitted). We cited an exhibit in the legislative history explaining that concern:

> "'The *Berry* case appears to raise fundamental problems in fields other than medical fields. If the Court is correct regarding its meaning of the word "accrued," the same reasoning might very well apply to mistakes of lawyers, engineers, title companies, and others. Thus, if a lawyer makes a mistake in giving an opinion as to the title to real property to the average citizen and the citizen relies upon the opinion and doesn't discover the error [for] ten years, would not the reasoning in the *Berry* case apply to litigation based upon an alleged injury to the rights of another under ORS 12.110?'"

*Id*. at 497 n 2 (quoting "a letter from Attorney John J. Coughlin to Attorney William Morrison under date of January 25, 1967").

It also is apparent that the legislature intended to adopt an absolute time limitation that would apply to negligence actions other than those at issue in *Berry*. Although, as passed by the Senate initially, SB 134 set an outside limit for filing only the type of negligence claim that clearly would have been governed by *Berry*'s discovery-rule holding, the scope of the bill changed when it moved to the House. As we observed in *Josephs*, representatives expressed concern—echoing the Coughlin exhibit quoted above—that the *Berry* discovery-rule holding might be equally applicable to extend the time for filing claims for other types of professional malpractice "in which a defendant's negligence went understandably undetected until after the pertinent statutes of limitation had expired." *Id*. at 497-98; Tape Recording, House Committee on Judiciary, SB 134, Apr 19, 1967, Tape 79 (remarks of Representative Wallace Carson and Representative James Redden). And representatives specifically named architects, engineers, lawyers, and accountants as professionals who might be liable under the reasoning of *Berry* for negligence that "went understandably undetected until after the pertinent statutes of limitation." *Josephs*, 260 Or at 497-98; *see* Tape Recording, House Committee on Judiciary, SB 134, Apr 6, 1967, Tape 72 (remarks of Representative James Redden, noting that the issue raised in *Berry* might make professional insurance more difficult to obtain and that it "does not deal with

doctors alone," giving examples including a "lawyer who wrote a contract ten years ago").

The House ultimately voted to amend the bill by adding a provision that would have defined when an action "accrued" for most actions in such a way that the statute of limitations would run from the date "the act or omission complained of occurred"—effectively making the statute of limitations serve the same outside cut-off role as a statute of ultimate repose.[6] *See Josephs*, 260 Or at 499 ("It is clear that the legislative committees which were dealing with the problem of long delayed tort litigation brought about by lack of discovery considered the possibility of defining the time when a cause of action 'accrued' as a response to the *Berry* decision."); SB 134 (1967) - 1 Amendment (Apr 20, 1967). Thus, although the Senate version of the bill would have enacted a seven-year outside limit for filing negligence actions that applied only to certain claims for medical negligence, the House version would have ensured that the applicable statute of limitations served as an outside limit for filing virtually all actions at law. For an action "for any injury to the person or rights of another, not arising on contract, and not especially enumerated in" ORS chapter 12, the statute of limitations was—and remains—two years. ORS 12.110(1).

The House and Senate then compromised on amendments to SB 134 that "left the discovery rationale of *Berry* intact, should this court subsequently choose to apply the *Berry* rationale to torts other than medical malpractice, but prescribed an ultimate [ten-year] cut-off date in any event for the commencement of tort claims litigation." *Josephs*, 260 Or at 499; *see also id*. (describing ORS 12.110(4) as relating specifically to medical malpractice claims and ORS 12.115(1) as "relating generally to other tort claims"). That history persuades us that the legislature intended to impose

---

[6] The version of the bill passed by the House added a proposed paragraph to ORS 12.010, the general statute of limitations, for "[a]ctions at law" that "[t]he cause of action shall be deemed to have accrued when the act or omission complained of occurred unless otherwise directed by law," but the House retained the Senate's discovery rule for medical negligence involving a "foreign substance"—"otherwise direct[ing]" when those actions accrued. House Judiciary Committee Report on SB 134 (Apr 20, 1967).

an outside limit of ultimate repose for negligence actions generally, and with a specific understanding that the limitation would apply to negligence actions against other professionals, including lawyers. Indeed, plaintiffs acknowledge that the legislature intended ORS 12.115(1) to apply to at least some actions alleging that the plaintiff suffered injury as a result of negligent legal representation.

That legislative history is difficult to reconcile with what plaintiffs propose to be a legislative intent to exclude from the new limitation any negligence action alleging injury to economic interests, which has long been understood to be a category of damages that a client may recover in a negligence action against the client's lawyer. For example, as early as *Currey v. Butcher*, 37 Or 380, 384-85, 61 P 631 (1900), this court held that the attorneys' client properly brought a negligence claim to recover financial expenses caused by negligent performance of professional duties because, "at common law[,] the injured party could sue" either in contract for breach of the implied promise or in tort for neglect of the duty. *See also Onita Pacific Corp. v. Trustees of Bronson*, 315 Or 149, 160-62, 843 P2d 890 (1992) (observing that the attorney-client relationship is one in which the failure to exercise reasonable care permits recovery of "economic losses," but declining to permit recovery of economic losses caused by negligent misrepresentation in arm's-length negotiations); *Laux v. Woodworth*, 169 Or 528, 529, 531, 129 P2d 290 (1942) (action to recover from allegedly negligent attorney the amount that the plaintiff believed she would have received by prevailing in the underlying action; claim rejected only because negligence allegations were conclusory); *Milton v. Hare et al.*, 130 Or 590, 596, 280 P 511 (1929) (action to recover for financial loss suffered when attorneys negligently allowed default foreclosure judgment to be taken and property sold; rejected because the defendants' negligence "was not the proximate cause of [the] plaintiff's loss").

We presume that, when the legislature adopted an ultimate repose limit that would apply to negligence claims against lawyers, the legislature was aware that negligence claims against lawyers commonly included claims for injury

consisting of purely financial loss. *See, e.g.*, *Montara Owners Assn. v. La Noue Development, LLC*, 357 Or 333, 341, 353 P3d 563 (2015) ("The context for interpreting a statute's text includes the preexisting common law, and we presume that the legislature was aware of that existing law."). And in compromising on a ten-year statute of repose that would reach claims for negligent injury caused by lawyers, the legislature used a term—"property"—that in both ordinary and legal usage was understood to include "tangible assets" such as money, and "intangible rights." *See Webster's* at 1818 (defining "property"); *Black's* at 1382 (same). Absent some specific indication that the legislature, nevertheless, intended to treat claims for negligent injury to economic interests more favorably than claims for negligent injury to persons and physical property, the text, context, and legislative history that we have examined point to a legislative compromise that permitted all negligence claims to be governed by a "discovery" rule for purposes of the statute of limitations and also subject to an outside limit on when the claim can be brought. We turn to what plaintiffs and the Court of Appeals identify as indications that the legislature, nevertheless, intended to treat claims for negligent injury to economic interests more favorably than claims for negligent injury to persons and physical property.

The Court of Appeals identified different contextual reasons to support its conclusion that the legislature intended the phrase "injury to person or property" to have a specialized, more limited, meaning when used in the phrase "negligent injury to person or property" in ORS 12.115(1), and plaintiffs urge us to follow that reasoning. That court primarily relied on this court's interpretation of a different, later-enacted statute. *See Marshall*, 316 Or App at 427 (describing this court's decision in *Securities-Intermountain v. Sunset Fuel*, 289 Or 243, 247, 611 P2d 1158 (1980), as "[o]f particular import"). In *Securities-Intermountain*, this court examined ORS 12.135, which the 1971 Legislative Assembly had enacted to impose new limits on the time for filing "[a]n action to recover damages for injuries to a person or to property" arising from "the construction, alteration, or repair" of real property improvements. 289 Or at 246-47. As we will explain, however, our analysis in *Securities-Intermountain*

of the 1971 legislature's intent in enacting ORS 12.135 does not alter our understanding of the intent of the 1967 legislature in enacting ORS 12.115.

At the time, ORS 12.135 specified that any action to which it applied "shall be commenced within two years from the date of such injury to the person or property; provided that such action shall be commenced within 10 years from substantial completion of such construction, alteration or repair of the improvement to real property." ORS 12.135(1) (1980).[7] The action in *Securities-Intermountain* involved a general contractor's claim against an architect and heating contractor seeking "financial losses from alleged breaches of contract" due to faulty installation of a defective heating system—what this court described as "a conventional action for breach of a contract in the building industry." 289 Or at 247, 250. The statutory construction question was whether the 1971 Legislative Assembly had intended the two-year statute of limitations in ORS 12.135 to apply to that type of action or whether the action was governed by the general six-year statute of limitations for contract claims—ORS 12.080. *Id.* at 247. Ultimately, this court concluded that the 1971 Legislative Assembly had not intended to shorten the statute of limitations for "financial losses such as a reduced value of the completed project due to the unsatisfactory performance of the work." *Id.* at 250-51. Rather, we concluded, the legislature had intended ORS 12.135 to apply only to "what is commonly meant by 'personal injuries,' *i.e.*[,] bodily injuries including their psychic consequences, and physical damage to existing tangible property." *Id.* at 251.

Plaintiffs emphasize that the 1971 Legislative Assembly carried out that intent by using a phrase that is

---

[7] ORS 12.135 has been amended several times, and the comparable provision now applies to

"[a]n action against a person by a plaintiff who is not a public body, whether in contract, tort or otherwise, arising from the person having performed the construction, alteration or repair of any improvement to real property or the supervision or inspection thereof, or from the person having furnished design, planning, surveying, architectural or engineering services for the improvement."

ORS 12.135(1). For such actions, the statute includes multiple options for the repose period and specifies that the statute of limitations is "[t]he applicable period of limitation otherwise established by law." *Id.*

*similar* to the phrase that the 1967 Legislative Assembly had used to describe actions subject to the 10-year statute of ultimate repose. And they ask us to conclude from that similarity that the 1967 Legislative Assembly similarly intended to limit the negligence statute of repose to negligence actions for bodily injuries and physical damages to tangible property. But *Securities-Intermountain* did not suggest that the phrase used in ORS 12.135—"injuries to a person or to property"—had a specialized legal meaning that refers only to an injury to a limited type of "property." On the contrary, this court began by noting that whether the phrase excluded injuries for financial losses could not be "wholly resolved by an examination of [ORS 12.135's] text" because "injury to property" did not "preclude the wider reading urged by [the] defendants that it covers such financial 'injuries' from faulty performance as, for instance, a reduced value of the building or the cost of substitute performance." *Id.* at 248.

Thus, this court looked to the particular context and legislative history of the statute to determine "whether ORS 12.135 applie[d] to a claim of financial losses from alleged breaches of contract by the persons so engaged." *Id.* at 247. And, because answering that question in the affirmative would mean that ORS 12.135 had replaced the existing six-year contract statute of limitations for claims governed by ORS 12.080, we focused particular attention on whether the 1971 Legislative Assembly had intended that result. We concluded that "[n]either the text nor the legislative history persuades us that" the 1971 Legislative Assembly intended the statute to eliminate "the six-year period of limitation on commencing a conventional action for breach of a contract in the building industry." *Id.* at 250.

We also pointed to legislative history indicating that the structure of the statute had been patterned on the approach that the legislature had taken in crafting the special limitations statute for "injuries to the person" caused by a medical, surgical, or dental treatment. *Id.* at 249-50 (citing ORS 12.110(4) (1971)).[8] What we meant is that, like

---

[8] As described above, ORS 12.110(4) was originally adopted by the 1967 Legislative Assembly as part of SB 134, as a special limitations period for injuries caused "where in the course of any medical, dental, surgical or other professional treatment or operation," a "foreign substance" was "negligently permitted

the structure of ORS 12.110(4) (1971), the structure that the 1971 Legislative Assembly chose for ORS 12.135 combined a statute of limitations—in the form of a requirement that the action "shall be commenced within two years from the date" of a specified event—with a period of ultimate repose—in the form of the caveat "provided that such action shall be commenced within" a longer outside time limit. That origin for the structure, and the "chosen analogy" of a statute applicable to actions for medical and dental malpractice, led this court to reason "that the contemplated injuries were those analogous to the 'injuries to the person' covered by ORS 12.110(4) [(1971)]." *Id*. at 250. Consequently, given our understanding that the legislature had not intended to shorten the statute of limitations for "a conventional action for breach of a contract in the building industry[,]" we concluded that the 1971 Legislative Assembly did not intend the limitations in ORS 12.135 to apply to actions for "financial losses such as a reduced value of the completed project due to the unsatisfactory performance of the work or the added cost of satisfactory completion or replacement." *Id*. at 251. In other words, our construction of the statute at issue in *Securities-Intermountain* depended on legislative history particular to ORS 12.135. Given the very different history of ORS 12.115, which we have described above, we are not persuaded that our decision in *Securities-Intermountain* informs our understanding of what the 1967 Legislative Assembly intended when enacting ORS 12.115.

Plaintiffs, nevertheless, argue that our conclusion in *Securities-Intermountain* about the meaning of the phrase "injury to *** property" in ORS 12.135 correctly captures an established legal distinction between injuries to "person or property" and injuries to purely economic interests, and they urge us to presume that the 1967 Legislative Assembly intended to capture that distinction when it enacted a statute of ultimate repose for "negligent injury to person or property." As noted, the context for interpreting a statute "includes the preexisting common law, and we presume that the legislature was aware of that existing law." *Montara*,

---

to remain" within the patient's body.  ORS 12.110(4) (1967). By 1971, however, the statute had been amended to extend to actions "arising from any medical, surgical or dental treatment, omission or operation[.]" Or Laws 1969, ch 642, § 1.

357 Or at 341. The Court of Appeals offered a slight variation on that reasoning when it pointed to the same "distinction between purely economic loss and injuries to persons or property that has long been the basis of the economic loss doctrine" to conclude that our construction of the statute at issue in *Securities-Intermountain* reflects "the 'plain, natural, and ordinary meaning' of the 'injury to person or property' language used in ORS 12.115(1)." *Marshall*, 316 Or App at 429, 430 (quoting *PGE*, 317 Or at 611).

We have already explained, however, that *Securities-Intermountain* rejected the notion that the phrase "injury to a person or to property" had a plain, natural, or ordinary meaning that would exclude "financial 'injuries' from faulty performance." 371 Or at 549-50 (quoting *Securities-Intermountain*, 289 Or at 248). And, although we ultimately concluded that the legislature had intended to distinguish between actions for "physical damage to existing tangible property" and actions for "financial losses such as a reduced value of the completed project due to the unsatisfactory performance of the work or the added cost of satisfactory completion or replacement," *id.* at 251, we did not rely on any established legal distinction between those categories of injury to reach our conclusion about legislative intent.

To explain what is often referred to as the "economic loss" doctrine, the Court of Appeals highlighted this court's decision in *Harris v. Suniga*, 344 Or 301, 180 P3d 12 (2008). As *Harris* explains, the economic loss doctrine in Oregon is reflected in the rule that "'one ordinarily is not liable for negligently causing a stranger's purely economic loss'" in the absence of "'some source of duty outside the common law of negligence,' *** such as a special relationship or status that imposed a duty on the defendant beyond the common-law negligence standard." *Id.* at 308 (quoting *Hale,* 304 Or at 284) (internal citation omitted; brackets from *Harris* omitted).

But Harris extensively described the history of Oregon's economic loss doctrine, and the earliest identified case post-dates the enactment of ORS 12.115. Id. at 307; see id. ("[T]his court has recognized the substance (although not the label) of the economic loss doctrine at least since Snow

v. West, 250 Or 114, 440 P2d 864 (1968)[.]"). Moreover, it is doubtful that anyone in 1968 would have recognized the substance of the economic loss doctrine from reading Snow, which held only that an employer does not have a cause of action in tort "for profits lost because of a negligent injury to an ordinary employee." Snow, 250 Or at 117-18.[9] And Snow emphasized that "[t]here [were] no Oregon decisions on the subject." Id. at 116. Indeed, it appears that the now-important distinction between negligently caused injury to tangible property and negligently caused injury to economic interests was first articulated in its currently recognizable form in this court's 1992 Onita decision, in which this court explained, "[i]n this opinion we use the term 'economic losses' to describe financial losses such as indebtedness incurred and return of monies paid, as distinguished from damages for injury to person or property." 315 Or at 159 n 6. In short, there is no historical basis for assuming that the 1967 Legislative Assembly would have understood the phrase "negligent injury to person or property" to have an established meaning that excludes financial loss.

Plaintiffs and *amici* urge us to conclude that existing law in 1967 recognized some distinction between the ability to recover for negligently caused economic loss and the ability to recover for negligently caused harm to physical property, even if our case law had not yet established a special meaning for the phrase "negligent injury to person or property" that excludes economic loss. And they urge us to presume that the legislature enacted ORS 12.115 with an awareness that existing law limited a plaintiff's ability to recover in negligence for economic loss, regardless of whether the phrase "injury to person or property" had come to have a special meaning by 1967. They cite a few cases that suggest some earlier limitations on claims involving economic loss. *See Ore-Ida Foods v. Indian Head*, 290 Or 909, 916, 627 P2d 469 (1980) (stating that the "prevailing rule in the United States and England is that a plaintiff may not recover for

---

[9] The reference to an "ordinary employee" presumably distinguished the one case that the court identified as permitting an action "to recover wages and maintenance and cure" that a ship owner paid to an injured seaman—a relationship viewed as "more akin to that of father to child rather than that of employer to employee." *See Snow*, 250 Or at 117 n 1 (citing *Jones v. Waterman S. S. Corporation*, 155 F2d 992 (3rd Cir 1946)).

economic loss resulting from negligent infliction of bodily harm to a third person," citing cases from other jurisdictions and legal treatises); *Price v. Gatlin*, 241 Or 315, 316-17, 405 P2d 502 (1965) (holding that the plaintiff, who alleged that defective tractor had caused economic loss to his business, could not hold the "wholesaler liable for innocently passing along" the defective tractor); *Wights v. Staff Jennings*, 241 Or 301, 303, 311, 405 P2d 624 (1965) *abrogated by Heaton v. Ford Motor Co.*, 248 Or 467, 435 P2d 806 (1967) (holding that non-negligent seller of boat, which had exploded from alleged defect, could be held liable to plaintiff who suffered personal injuries during explosion, if jury found the defect created an ultrahazardous condition).

Although we question whether anyone in 1967 would have understood those cases as suggesting a doctrine that liability for negligence ordinarily does not extend to liability for purely financial loss, the bigger challenge for plaintiffs is that their premise does not lead to the conclusion that they seek. First, a doctrine that governs what type of damages can be recovered in a negligence action has no apparent bearing on a statute that controls the time within which a negligence action can be filed. Moreover, even if we assume that the legislature understood in 1967 that negligence *generally* did not expose the negligent party to liability for injury to solely economic interests, we have already explained that the relationship between lawyer and client is one of the types of relationships that exposes the negligent party to liability for injury to economic interests, and the legislative history of ORS 12.115 makes clear that the legislature intended the ultimate repose limit on actions for "negligent injury to person or property" to apply to actions in which a lawyer's negligence caused the injury. 371 Or at 545, 547. Thus, an assumed awareness that such liability generally would not arise in negligence actions tells us nothing about whether the legislature intended to limit the time for bringing negligence actions in which liability for injury to the plaintiff's economic interests is cognizable. And plaintiffs have identified no reason why the legislature would have chosen to treat actions to recover for negligently caused economic injury more favorably than actions

for negligently caused physical injury—the converse of the preference reflected in the economic loss doctrine.

Plaintiffs, nevertheless, urge us to conclude that the legislature *did* intend to adopt a statute of ultimate repose that limits the time in which to file actions for negligent injury to physical property, while sparing actions for negligent injury to other categories of property, by pointing to the context of what they consider to be a related statute. Specifically, plaintiffs emphasize that ORS 12.110(1), which establishes a statute of limitations for an action "for any injury to the person or rights of another," uses a different phrase to describe the covered actions than the phrase that the legislature used in ORS 12.115(1). That statute of limitations provision was in effect at the time that the 1967 Legislative Assembly enacted ORS 12.115 and, indeed, was shown as existing statutory text in the bill that added the new repose statute. *See* Or Laws 1967, ch 406, § 2(2). According to plaintiffs, the legislature's decision to use a different phrase for the negligence statute of repose provision in ORS 12.115(1) indicates that the legislature intended the provision to govern a different—and more limited—category of actions than those governed by ORS 12.110(1). Justice Masih's dissent assigns significance to that different terminology in concluding that the legislature intended to exempt claims for negligent injury to economic interests from the statute of ultimate repose, as did the Court of Appeals. 371 Or at 571, 572 (Masih, J., dissenting); *see also Marshall*, 316 Or App at 431 ("We cannot ignore the fact that the legislature chose to forgo the broader language previously adopted in ORS 12.110(1) when it enacted ORS 12.115(1) and instead adopted narrower language."). But we are not persuaded.

The *premise* of that argument may be sound, but the conclusion does not follow. In other words, it is true that the legislature used a different phrase in ORS 12.115(1) than the existing phrase in ORS 12.110(1), and we generally assume that when the legislature uses different terms—at least in the same statute—it intended different meanings. *See Dept. of Transportation v. Stallcup*, 341 Or 93, 101, 138 P3d 9 (2006) (use of different terms in real estate appraisal statute suggests that each was intended to have different

meaning). But "[s]uch 'rules' of interpretation are mere assumptions that always give way to more direct evidence of legislative intent." *State v. Lane*, 357 Or 619, 629, 355 P3d 914 (2015). And we have already explained that the text and legislative history supply more direct evidence that the legislature compromised on a bill that would leave open the possibility that *Berry*'s discovery rule could extend the statute of limitations for other professional negligence claims while also setting an outside limit on when such claims could be brought. In doing so, the legislature limited the period of ultimate repose to claims for "negligent injury to person or property of another," but it did not limit the period of ultimate repose to claims for "negligent injury to the person or [*physical*] property of another," and it expressed no intent to limit the period of ultimate repose according to whether the professional negligence caused injury to physical property as opposed to injury to other types of property. 371 Or at 546.

Both the provision at issue in ORS 12.115(1) and the reference in that statute to ORS 12.110 were a product of the two weeks that the bill spent in Conference Committee. As Justice Masih's dissent points out, "[r]ecords of what happened in the Conference Committee are limited to a few margin notes and a summary report." 371 Or at 571 (Masih, J., dissenting). Thus, there is no evidence of why the legislature did not simply copy the phrase set out in ORS 12.110(1)—"any injury to the person or rights of another"—when describing the scope of actions that would be governed by the period of repose. But multiple distinctions between the two statutes highlight possible explanations for the slight variation in phrasing, beyond plaintiffs' assumption that the legislature intended to limit the new period of repose to claims for negligently caused injury to physical property.

First, the phrase set out in ORS 12.110(1) reaches claims for intentional injury as well as claims for negligent injury. The legislature's decision to use a different phrase in ORS 12.115(1) might be explained by the fact that the new statute of repose applied only to actions for negligent injury, precluding the legislature from simply copying the phrase from ORS 12.110(1). Second, as defendant points out,

the text now found in ORS 12.110(1) was written more than 100 years before the legislature adopted ORS 12.115(1). *See* General Laws of Oregon, Civ Code, ch I, title II, §§ 3, 6, 8, p 140-41 (Deady 1845-1864) (setting out provisions now found at ORS 12.110(1)). And the pertinent phrasing of ORS 12.110(1) has been in place since 1919. Or Laws 1919, ch 122, § 1. *But see* Or Laws 1981 ch 149, § 1 (removing actions for "criminal conversation" from the list of actions governed by ORS 12.110). Thus, the difference between "injury to the person or rights of another" and "negligent injury to person or property" might simply reflect a preference for contemporary negligence terminology. Ultimately, we cannot know why the legislature used the term "property" rather than "rights" when drafting the compromise provision of ORS 12.115(1). But we cannot assume that it did so because it intended to limit the scope of ORS 12.115(1) to claims for negligent injury to physical property, when the term "property" was readily understood to reach economic interests and the legislative history indicates that the legislature intended the period of ultimate repose in ORS 12.115(1) to apply to actions for legal negligence—negligence that by long tradition gave rise to liability for injury to economic interests.[10]

## CONCLUSION

Based on the text, context, and helpful legislative history, we are persuaded that the legislature did not intend to spare actions for negligent injury to economic interests from the ultimate cut-off date that it prescribed in ORS 12.115(1) for "any action for negligent injury to person or property." Thus, the trial court correctly rejected plaintiffs' argument that ORS 12.115(1) does not bar claims for negligent injury to economic interests. Because the Court of Appeals held otherwise, it did not address plaintiffs' alternative, second assignment of error, which challenged the

---

[10] We emphasize that the significance of the statute of repose is that it foreclosures claims for negligently caused injury regardless of whether the injury was discoverable. *See Shasta View Irrigation Dist.*, 329 Or at 162 (so explaining). For lawyers who practice in areas of the law in which negligence routinely goes undiscovered for more than a decade, the compromise that the legislature struck for ORS 12.115 falls disproportionately on the clients, whose claims will be foreclosed before they even accrue. But any adjustments to address that disparity are a matter of policy choice for the legislature to address.

trial court's conclusion that ORS 12.115(1) bars plaintiffs' claims. Our contrary construction of the statute makes it appropriate to remand to Court of Appeals, for that court to now consider plaintiffs' second assignment of error.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for consideration of plaintiffs' second assignment of error.

**JAMES, J.,** dissenting.

In my view, this case exposes a gap in our usual statutory construction methodology derived from *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). Under that approach, when "the legislature has not defined a particular term, we assume that the legislature intended to give words of common usage their 'plain, natural, and ordinary meaning.'" *State v. Clemente-Perez*, 357 Or 745, 756, 359 P3d 232 (2015). In that instance, we generally look to the common dictionary understanding of the term. There is an exception to that rule, however. When the legislature uses what we call a "term of art," we do not turn to common dictionary definitions; we instead "look to the meaning and usage of those terms in the discipline from which the legislature borrowed them." *Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 296-97, 337 P3d 768 (2014).

Critically, this court has never clearly articulated a methodology for *how* it determines, in the first instance, whether a term is one of "common usage" or a "term of art." In theory, that should be no different than our approach to any other statutory question, resolved by consideration of the statute's text, context, and legislative history. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). In practice, however, I am not sure our approach to legislative intent in this area has been without flaw. Discerning legislative intent is a question resolved through the examination of a historical record. And all approaches to history carry the risk of cognitive bias by the historian. I believe our treatment of this issue may evidence that.

In reviewing the case law where this court has considered whether to classify terms as "common usage" or "terms of art," no clear methodology emerges. At times, we

have simply announced that the term, by its very nature, was not of common usage, even if we later concluded the common and term of art definitions were the same. *See, e.g.*, *State v. McNally*, 361 Or 314, 322, 392 P3d 721 (2017) ("The phrase 'passive resistance' is a term of art that has the same meaning whether considered in a lay or a legal context."). At other times, we have implied a more historically grounded approach, but, even then, included language minimizing the consistency of the application of that approach. *See, e.g., Comcast Corp.*, 356 Or at 296 (explaining that we will "*potentially* also consider the overall statutory scheme in which a legal term appears, as well as the meaning that the term has for regulators who oversee the field") (emphasis added). And at other times, we simply refused to engage with the question altogether. *See, e.g.*, *Oak Lodge San. Dist. v. Gen. Ins. Co.*, 240 Or 103, 106, 399 P2d 351 (1965) ("We prefer not to engage in a definitional exercise which might cause the words 'work' and 'project' to be regarded as terms of art. Such a result could create unforeseen mischief for future litigants and is not necessary to a decision in this case.").

The lack of a defined methodology has resulted in our classification of terms in ways that, when viewed together, struggle to paint a coherent methodological picture. We have labeled the terms "lawful order," "risk," "danger," "material," "departure," and "threatens" as common. *See, e.g.*, *State v. Ausmus*, 336 Or 493, 503-04, 85 P3d 864 (2003) ("lawful order"); *Woodbury v. CH2M Hill, Inc.*, 335 Or 154, 161, 61 P3d 918 (2003) ("risk" and "danger"); *State v. Rogers*, 334 Or 633, 640, 55 P3d 488 (2002) ("material" and "departure"); *State v. Hall*, 327 Or 568, 572-73, 966 P2d 208 (1998) ("threatens"). In contrast, sometimes without much explanation, we have labeled the terms "form," "unconscionable," "appraisal," and "mental disease or defect" as terms of art. *See, e.g.*, *State v. Haji*, 366 Or 384, 402-04, 462 P3d 1240 (2020) ("form"); *Gordon v. Rosenblum*, 361 Or 352, 361, 393 P3d 1122 (2017) ("unconscionable"); *Dept. of Transportation v. Stallcup*, 341 Or 93, 99-102, 138 P3d 9 (2006) ("appraisal"); *Tharp v. PSRB*, 338 Or 413, 423, 110 P3d 103 (2005) ("mental disease or defect").

Although terms of art can come from any discipline, legal terms of art pose a particular problem for courts. Numerous terms appear in the law, and although some, like "probable cause" have no common meaning outside the legal context, other terms, like "property," have legal meanings and common meanings, and the two may conflict in various ways. As the majority explains, certain legal definitions of "property" include "'everything which is the subject of ownership, corporeal or incorporeal, tangible or intangible, visible or invisible, real or personal *** extend[ing] to every species of valuable right or interest.'" 371 Or at 542-43 (quoting *Black's Law Dictionary* 1382 (4th ed 1951)). But the common understanding of the term "property" may have an aspect of tangibility to it that a legal definition does not. For example, *Webster's* defines "property" to mean, among other things, "[s]omething that is or may be owned or possessed: WEALTH, GOODS; *specif* : a piece of real estate *** the house … surrounded by the ~ *"Webster's Third New Int'l Dictionary* 1818 (unabridged ed 2002).

If initial classification of terms as ones of "common usage" or "terms of art" is a search for legislative intent, then the cognitive bias of the court, as historian, is that courts are preconditioned to view such terms as legal terms of art, because courts are trained and immersed in the law. But Oregon employs a part-time, citizen legislature. Although many members of that body are lawyers, the vast majority are not. And although the legislature is advised by lawyers in the Legislative Counsel's Office, the general drafting guidelines of that office set the expectation to legislative members that terms that give rise to legally specific meanings typically should be avoided. *See, e.g.*, Oregon Legislative Assembly, *Bill Drafting Manual* 4.12 (18th ed 2018) ("A drafter may be tempted to make an extravagant use of elegant words when simpler expression is adequate. For example, use of 'respectively' usually is superfluous. The drafter needs also to avoid words that give rise to legal arguments. 'Valuable consideration' raises a whole series of law school questions that 'compensation' does not. 'Bona fide' is

not only usually mispronounced but is subject to argument on its specific meaning.")[1]

In this case, the issue is the meaning of "negligent injury to person or property" in ORS 12.115(1). The Court of Appeals resolved that question by treating the terms as words of common usage, reasoning by reference to our previous decisions which had treated similar language in different context as words of common usage:

> "And although *Securities-Intermountain*[ *Inc. v. Sunset Fuel Co.*, 289 Or 243, 611 P2d 1158 (1980)] and *Portland Trailer*[ *& Equip., Inc. v. A-1 Freeman Moving & Storage, Inc.*, 166 Or App 651, 5 P3d 604 (2000), *opinion adh'd to as modified on recons*, 168 Or App 654 (2000)] both construe provisions enacted after ORS 12.115 was passed in 1967, and both cases were obviously decided after ORS 12.115 was enacted as well, they remain relevant to our construction of ORS 12.115(1). Those constructions reflect the plain, natural, and ordinary meaning of the 'injury to person or property' language used in ORS 12.115(1)."

*Marshall v. PricewaterhouseCoopers, LLP*, 316 Or App 416, 430, 505 P3d 40 (2021) (some internal quotation marks

---

[1] I encourage readers to not take my critique of method in this case as a disguised call for Oregon to employ corpus linguistics. "Corpus linguistics is the empirical study of language using samples (or bodies) of texts called corpora (in the plural). A corpus is constructed in order to study a particular register (variety of texts associated with a situational context) or speech community (group of language users who share the same dialect or language norms)." James C. Phillips & Jesse Egbert, *A Corpus Linguistic Analysis of 'Foreign Tribunal'*, 108 Va L Rev Online 207, 220 (2022); *see also* Stephen C. Mouritsen, *Hard Cases and Hard Data: Assessing Corpus Linguistics as an Empirical Path to Plain Meaning*, 13 Colum Sci & Tech L Rev 156, 160-61 (2012) ("When judges *** demand that statutory terms be interpreted according to their ordinary meaning, they implicate a set of empirical questions, many of which are amenable to different types of linguistic analysis. *** [I]n the field of corpus linguistics, scholars rely on large electronic databases called corpora to determine *** those meanings that are consistent with common usage *** or *** the term's ordinary or most frequent meaning.").

Corpus linguistics has existed in the academic field of linguistics for some time, but has recently come into vogue in legal circles. Although I do not entirely foreclose what corpus linguistics might offer the law, it is potentially problematic on many levels, including suffering from the limitations and biases of those who compile the corpus, manipulation through the choice of database, and potentially overly suggestive results due to the construction of the search terms and methods. For those reasons, I have consciously declined to employ a corpus linguistics argument in this dissent. I know courts to be generally poor historians, by academic standards; I suspect we are even worse linguistic researchers.

omitted). That court reviewed case law and noted that the common meaning of "injury to person or property" was at odds with "purely financial loss that does not appear to involve physical damage to tangible property or implicate the ownership or disposition of property." *Id.* at 427-30. The court ultimately concluded:

> "Plaintiffs' claim against [defendant] is an action to recover legal fees associated with the \*\*\* transaction [in question] and later IRS investigation and litigation, as well as the financial losses plaintiffs suffered when they were found liable to the IRS for over $20 million in back taxes, penalties, and interest. Those injuries fit firmly within our established definition of 'economic loss' and form a claim that seeks recovery for 'indebtedness incurred [or] return of monies paid.' \*\*\* Plaintiffs' claim does not assert any 'injury to person or property,' because it does not implicate physical damage to existing tangible property or relate to the ownership and disposition of property."

*Id.* at 432 (citations omitted). The Court of Appeals was entirely correct.

The majority's reversal of the Court of Appeals' decision in this case hinges on treating "property" as a legal term of art and then defining it in such a manner so as to include ephemeral types of potential economic losses, such as future tax penalties, so as to require reversal. That argument—categorizing the term as a legal term of art—was never made to the Court of Appeals. It appears for the first time in arguments to this court. That gives me pause. I do appreciate, however, the majority not simply accepting the parties' assertion that this is a term of art without examination. That critical examination alone is an improvement over our past practices.

But, ultimately, the majority does not persuade me *why* the term must be treated as a legal term of art. The majority reasons that a term of art definition must have been intended by the legislature because the statute "addresses a legal concept—an outside limit on when a legal action for negligence can be filed—meaning that the intended audience was those who would file, or defend against, a legal negligence action." 371 Or at 542. Yet we have construed

terms as ones of "common usage" in legislation involving legal actions numerous times, as previously cited. For me, I remain unconvinced, because I read the majority reasoning as assuming what it sets out to prove—that is, that we're dealing with a *legal* concept of property and not the common understanding of the term.

From my review of the legislative record of ORS 12.115(1), I find no indication that the legislature knowingly employed the term "property" as a legal term of art, as opposed to a term of common meaning imputing a tangible nature, and the majority points to no legislative history that would make it clear that the legislature understood itself to be knowingly adopting a specialized "term of art" definition of property. Without that necessary showing in the historical record, in my view, the majority errs in one of two ways.

First, and the least damaging, is that our opinion today simply continues our tradition of not fully explaining why a term is a "term of art." In this manner, we do little more than add to an already incongruous area of the law—announcing a result, but not clarifying the methodology.

But more concerning to me is that our opinion today could be read as impliedly announcing a new rule of statutory interpretation in its reversal of the Court of Appeals' approach—that the preliminary classification of statutory terms into "common usage" versus "terms of art" employs a presumption in favor of term of art definitions any time that the legislative subject might roughly be understood to speak to an audience of lawyers. In such instances, when the legislature uses a word that parties, or courts, can subsequently identify as a term of art, at any stage of appellate review, courts will adopt the term of art meaning—and lower courts err in failing to adopt that meaning—even when no evidence in the legislative record suggests that the legislature themselves knew of that meaning, knew the source of that meaning, or knowingly adopted that meaning. I respectfully decline to endorse that approach.

From my perspective, labeling a term as a "legal term of art," simply because the *court* recognizes that the term has a particular meaning in the law, invites potential

cognitive bias into the process, resulting in potentially flawed history and, accordingly, potentially flawed identification of legislative intent. I would, therefore, employ the opposite presumption than the majority: that all terms employed by the legislature are terms of common usage, unless the context and the legislative record establishes that the legislature *knowingly* employed a term of art definition.[2]

Construing the term as one of common usage does not end the inquiry, however. I agree with the majority that *some* common definitions of property could reach intangible future "valuable right[s] or interest[s]." 371 Or at 542-43. But some clearly do not reach so far, and the questions remains—which is more likely to have been the legislature's intent?

I conclude that the legislature, in 1967, was most likely employing a definition of property that implies tangibility. In addition to the reasoning employed by the Court of Appeals, which I believe to be correct, I note that the statute's phrase "injury to person or property" is not to be read as a unitary concept, but as a short list. When viewed as a list, the word "property" follows the word "person" within the statute, a clearly tangible term. "[W]hen the legislature chooses to state both a general standard and a list of specifics, the specifics do more than place their particular subjects beyond the dispute; they also refer the scope of the general standard to matters of the same kind, often phrased in Latin as *'ejusdem generis.'"* *Bellikka v. Green*, 306 Or 630, 636, 762 P2d 997 (1988). Accordingly, when terms follow one another in a statute, and those terms begin narrowly, but conclude more generally, we often look to the shared "basic characteristics" of each to construe the more general term. *See, e.g., Lewis v. CIGNA Ins. Co.*, 339 Or 342, 350-51, 121 P3d 1128 (2005). Here, the commonality between person and property is tangibility.

Further, just a few years before the statute in question was enacted in 1967, we discussed, at some length, the

---

[2] Even if we could conclude that the legislature intended to adopt a term of art definition, as Justice Masih persuasively notes in her dissent, Blackstone defined property in a manner that is arguably inconsistent with the term of art definition proffered by the majority. *See* 371 Or at 567 (Masih, J., dissenting). The lack of uniformity even among the term of art definitional sources further highlights the need for grounding in the legislative record.

differing conceptions of property in *State v. Tauscher*, 227 Or 1, 11-13, 360 P2d 764 (1961). There, we noted that one common definition of property could "include all rights which are of value," including "ownership interests which are not capable of possession." *Id*. at 11-12. But we also noted that property could be understood to mean "only physical property capable of possession." *Id*. at 12.

In *Tauscher*, we ultimately held that the crime of embezzlement did not reach to the intangible property involved in that case, reasoning:

> "The interest which the Association had in the checking account was an *intangible* chose in action. This type of chose is to be contrasted with *tangible* choses in action, a term used to describe certain commercial documents such as bonds, bills of exchange, bank checks and promissory notes. \*\*\* Such tangible choses are capable of being possessed; intangible choses are not.
>
> "\*\*\*\*\*
>
> "In the case at bar, we are of the opinion that the checks, while in the defendant's possession, were not tangible choses in action. Thus the checks were not 'property' within ORS 165.005 and ORS 164.310. Therefore, defendant did not and could not embezzle the checks."

*Id*. at 13-15.

Certainly, *Tauscher* involved an entirely different statute, and context, than this case. But it establishes that, by 1967, the legislature was aware of the difference between tangible and intangible property, and that, at least for some statutes, this court would construe the common definition of "property" narrowly, to mean tangible property. It is therefore meaningful, in my view, that the 1967 Legislative Assembly took no steps to include terms such as "intangible property," "rights," or "interests" in the wording of the statute. Given *Tauscher*, the legislature understood that, if it intended a statute to reach beyond the common, tangible, definition of property, it might need to clearly say so. It did not.

The Court of Appeals relied on our holding in *Securities-Intermountain*, where we said, "'injuries to \*\*\* person(s) or to property' was thought to encompass what is

commonly meant by 'personal injuries,' i.e. bodily injuries including their psychic consequences, and physical damage to existing tangible property, but not financial losses \*\*\*." 289 Or at 251. I view the reasoning expressed by this court in *Securities-Intermountain* in 1980 as a continuation of the concepts expressed in *Tauscher*, in 1961. Given that context, I find it more likely that the 1967 Legislative Assembly—operating squarely in that time period—intended the use of the term "property," without any qualifiers, to reflect the common, narrow, tangible definition of the term.

For those reasons, I cannot conclude that the Court of Appeals' decision was incorrect. I therefore respectfully dissent.

**MASIH, J.,** dissenting.

I would affirm the decision of the Court of Appeals, holding that plaintiffs' claim is not barred by ORS 12.115(1) because "it does not implicate physical damage to existing tangible property or relate to the ownership and disposition of property" and therefore, does not assert any "injury to person or property" within the meaning of ORS 12.115(1). *Marshall v. PricewaterhouseCoopers, LLP*, 316 Or App 416, 432, 505 P3d 40 (2021). I agree with the Court of Appeals that we cannot ignore the legislature's choice to forgo the broader wording of "injury to person or rights of another" from ORS 12.110(1) when it enacted ORS 12.115(1).[1] 316 Or App at 431. And I disagree with the majority that the omission of the broader "rights of another" wording might simply reflect a preference for modern legal terminology. There is nothing in the legislative history to indicate such a preference, and ordinarily, when the legislature uses different terms, we assume

---

[1] At the time when ORS 12.115 was enacted, ORS 12.110(1) (1965) provided:

"An action for assault, battery, false imprisonment, for criminal conversation, or for *any injury to the person or rights of another*, not arising in contract, and not especially enumerated in this chapter, shall be commenced within two years; provided, that in an action at law based upon fraud or deceit, the limitation shall be deemed to commence only from the discovery of the fraud or deceit."

(Emphasis added.) That pre-existing wording in ORS 12.110(1) is important context for interpreting the meaning of ORS 12.115(1), because the same bill (Senate Bill (SB) 134 (1967)) that created ORS 12.115(1), also created ORS 12.110(4), and ORS 12.115(2) explicitly refers to ORS 12.110. Thus, ORS 12.115 and ORS 12.110 are intended to be read together.

that the legislature intends those terms to have different meanings, particularly when the terms appear together in the same statutory scheme and may give rise to different legal consequences. *See, e.g.*, *Norwood v. Premo*, 287 Or App 443, 451, P3d 502, *rev den*, 362 Or 300 (2017) (stating standard and citing *Dept. of Transportation v. Stallcup*, 341 Or 93, 100-01, 138 P3d 9 (2006)). Ultimately, the "text" selected by the 1967 Legislative Assembly to capture its intent in ORS 12.115(1) is "negligent injury to person or property," instead of "any injury to the person or rights of another."

Both phrases appear to have their roots in the common law, and the former covers only a subset of the natural rights of persons. *See, e.g.*, *Kosciolek v. Portland Ry., L. & P. Co.*, 81 Or 517, 522, 160 P 132 (1916) ("The natural rights of a person at common law are the right of personal security in the legal enjoyment of life, limb, body, health, and reputation, the right of personal liberty, and the right of private property." (citing William Blackstone, 1 *Commentaries on the Laws of England* 125-29 (1st ed 1765))). At common law, the term "property" had a generally understood meaning.[2] Blackstone divided property into real and personal property. He described "real property" as property "which consists of such things as are permanent, fixed, and immoveable; as lands, tenements, and hereditaments of all kinds, which are not annexed to the person, nor can be moved from the place in which they subsist." William Blackstone, 3 *Commentaries on the Laws of England* 144 (1st ed 1768). And he described "personal property" as property "which consists of goods, money, and all other moveable chattels, and things thereunto incident; a property, which may attend a man's person wherever he goes, and from thence receives its denomination[.]" *Id.* Legal dictionaries also defined "property" to mean, among other things, the "[r]ightful dominion over external objects; ownership; the unrestricted and exclusive right to a thing; the right to dispose of the substance of a thing in every legal way, to possess it, to use it, and to exclude everyone else

---

[2] I agree with Justice James's dissent that we should look for legislative intent to characterize a term as a legal term of art. *See* 371 Or at 563-64 (James, J., dissenting). In the absence of such an intent, we should give words outside the legal context their common meanings. I trace the history of the legal definition here, because that is the approach that the majority followed, but, as explained, I reach a different conclusion.

from interfering with it." Henry Campbell Black, *Dictionary of Law Containing Definitions of the Terms and Phrases of American and English Jurisprudence, Ancient and Modern* 953 (1891).

Generally, under the common law, negligent injury to such rights encompassed only physical damage to real or personal property. *See Harris v. Suniga*, 344 Or 301, 310, 180 P3d 12 (2008) (explaining that, in this court's economic loss cases, "the court [had] adher[ed] to the distinction that had developed in the common law between 'purely economic losses,' on the one hand, and damages for physical injuries to person or property, on the other"). In *Ore-Ida Foods v. Indian Head*, this court referred to those common-law roots, noting that "[t]he prevailing rule in the United States and England is that a plaintiff may not recover for economic loss resulting from negligent *** harm to a third person." 290 Or 909, 916, 627 P2d 469 (1981). There, this court cited *Snow v. West*, 250 Or 114, 440 P2d 864 (1968), along with a 1903 case from Georgia and a 1966 case from England, as good examples. *Ore-Ida Foods*, 290 Or at 917 (citing *Snow*; *Byrd v. English*, 117 Ga 191, 43 SE 419 (1903); *Weller & Co. v. Foot & Mouth Disease Research Institute*, 1 QB 569 (1966)). In *Hale v. Groce*, this court explained that, to recover for purely economic losses, "[i]t does not suffice that the harm is a foreseeable consequence of negligent conduct that may make one liable to someone else, for instance to a client. Some source of a duty outside the common law of negligence is required." 304 Or 281, 284, 744 P2d 1289 (1987). Thus, to support negligence claims for purely financial loss, this court has looked for other professional, special, or contractual relationships, which may give rise to a duty to exercise reasonable care on behalf of another's interests. *See, e.g.*, *Onita Pacific Corp. v. Trustees of Bronson*, 315 Or 149, 159-62, 843 P2d 890 (1992) (stating and applying rule in claim for negligent misrepresentation).

The majority points out that those cases describing the "economic loss doctrine" post-date the 1967 enactment of ORS 12.115(1) and also that this case involves a "special relationship" between an attorney and a client, which was recognized at common law to impose an obligation

to exercise extra care to avoid negligent injury, including injury resulting in purely financial losses. *See Currey v. Butcher*, 37 Or 380, 385, 61 P 631 (1900) ("Where one adopts the legal profession, and assumes to exercise its duties [on] behalf of another for hire, the law imposes a duty to exercise reasonable care and skill, and, if an injury results to his client from want thereof, he is liable to respond in damages to the extent of the injury sustained. This duty and liability arise from the relation of the parties under the contract, rather than from the contract itself."); 371 Or at 546-47, 552. But the fact that an attorney may be held liable for negligent injury to a client's economic interests does not necessarily require the conclusion that purely financial losses constitute an injury to "property." However, I agree with the majority that it may be helpful to review legislative history to understand whether the legislature nevertheless intended to define "property" more broadly than the term's common usage suggests.[3] *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).

When Senate Bill (SB) 134 (1967) was pending before the Senate Committee on Judiciary, Senator Willner moved that the committee counsel prepare an amendment to describe all malpractice situations and not just the certain kinds defined in the bill, which at that point contained only the provision regarding medical malpractice that was later enacted as ORS 12.110(4). Minutes, Senate Committee on Judiciary, Mar 14, 1967, 3. Chairman Mahoney ruled the

---

[3] In our prior cases, we have cited our decision in *Josephs v. Burns*, 260 Or 493, 491 P2d 203 (1971), *abrogated on other grounds by Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 23 P3d 333 (2001), as authoritative on the question of the legislative history of ORS 12.115. However, in that case, there was no question that there was negligent injury to real and personal property. There, the roof of a building owned or leased by plaintiffs collapsed 17 years after the architects and engineers had provided the professional services that were alleged to have been negligent. Plaintiffs brought an action for damages to "real and personal property." The question before this court was whether the professional malpractice claims against the architects and engineers—professional malpractice claims that could not have been discovered within the period of ultimate repose but which arose out of physical injury to real and personal property—were intended by the legislature to be included within the scope of ORS 12.115(1). This court determined that they were. Now, we must determine whether the legislative history also supports the conclusion that such claims would be covered even if there is no physical injury to real or personal property. Thus, the discussion of legislative history in *Josephs* is of limited use here.

motion "out of order." *Id*. The bill passed out of committee and was approved by the Senate without any amendment covering malpractice claims other than medical malpractice. *See* Senate Judiciary Committee Report on SB 134 (Mar 22, 1967).

In the House Committee on Judiciary, the legislators reviewed SB 134 in conjunction with House Bill (HB) 1309 (1967), a bill that focused on defining the term "accrued" for purposes of ORS 12.010[4] generally, in response to this court's decision to adopt a discovery rule for medical malpractice claims in *Berry v. Branner*, 245 Or 307, 421 P2d 996 (1966).[5] Committee members discussed the need for some finality for other types of malpractice claims not covered by SB 134, but acknowledged that different professional groups were beginning to pursue bills for their respective industries. *See* Tape Recording, House Committee on Judiciary, SB 134, Apr 19, 1967, Tape 79.

Ultimately, the House chose not to use all-encompassing language regarding malpractice and opted instead to add to SB 134 its HB 1309 definition of "accrued," with an "unless otherwise directed by law" clause. *See* House Judiciary Committee Report on SB 134 (Apr 20, 1967). Legislative Counsel Donald Paillette reassured Senator Mahoney that the House amendment to SB 134 "would not affect the basic provisions of the bill[,] since it provides a separate test for medical malpractice cases." *See* Staff Memorandum, House Committee on Judiciary, SB 134 (1967) (memorandum from Donald Paillette concerning amendments to SB 134).

Thus, despite concerns expressed in committee, the actions of both the Senate and the House going into the Conference Committee indicated only a willingness to bring finality to medical malpractice claims and some subset of

---

[4] At the time, ORS 12.010 (1965) provided in relevant part:

"Actions at law shall only be commenced within the periods prescribed in this chapter, after the cause of action shall have accrued, except where a different limitation is prescribed by statute."

[5] In *Berry*, we determined that a cause of action for medical malpractice involving a foreign object left in the body did not "accrue" for purposes of commencing the statute of limitations until the injury was discovered or, in the exercise of reasonable care, should have been discovered by the patient. 245 Or at 316.

other professional malpractice claims not otherwise provided for by law. In other words, the legislature was open to tackling the malpractice issue in stages, perhaps with some sensitivity to the industry involved, and was interested, in the meantime, in limiting the impact of the decision in *Berry* more generally.

Records of what happened in the Conference Committee are limited to a few margin notes and a summary report. *See* Conference Committee Report on Amendments to SB 134 (May 12, 1967). The report recommended only that the House "recede" from its amendment and that the bill be amended to add the following text:

> "(1)   In no event shall any action for negligent injury to person or property of another be commenced more than 10 years from the date of the act or omission complained of.
>
> "(2)   Nothing in this section shall be construed to extend any period of limitation otherwise established by law, including but not limited to the limitations established by ORS 12.110."

Conference Committee Report on Amendments to SB 134 (May 12, 1967).

Clearly, the legislature reviewed and considered the scope of ORS 12.110 in the Conference Committee when it included a reference to that statute in its final amendments to SB 134. Yet, it chose not to track the broader ORS 12.110(1) wording of "injury to the person or rights of another" to modify "negligent" in SB 134. The legislature also chose to forgo a statute of repose targeting all professional malpractice claims, as requested originally by Senator Willner, such that we might be able to conclude that the legislature intended to impose a definite cutoff on all claims against lawyers, including claims for purely financial loss. Thus, although the legislative history demonstrates that the legislature was concerned about the lack of a definite cutoff point for professional malpractice claims following this court's decision in *Berry*, it does not support the conclusion that the legislature intended to cut off *all* such claims—particularly claims involving purely "financial loss," which are distinct and separate from any "injury to person or property." Had the legislature intended to cut off all such claims, it would

have used the broader wording of "injury to person or rights of another" that already existed in ORS 12.110(1).

Instead, by using the more limited wording of "injury to person or property," the legislature left open the possibility that it may have to revisit professional malpractice claims, and it did so after 1967. ORS 12.135, which this court construed in *Securities-Intermountain v. Sunset Fuel*, 289 Or 243, 247, 611 P2d 1158 (1980), to exclude claims for purely financial losses, is exactly such an example. As the Court of Appeals noted, that statute has been reviewed and amended by the legislature multiple times since this court's decision in *Securities-Intermountain*. *Marshall*, 316 Or App at 427 n 6. We should trust that the legislature will do its part to clarify and make changes as needed.

For those reasons, I respectfully dissent.